734 N.E.2d 1107 (2000)
The Matter of the Termination of the Parent-Child Relationship of A.P., Minor Child, Brenda Phelps, Mother and Elvis Pack, Father, Appellants-Respondents,
v.
PORTER COUNTY OFFICE OF FAMILY AND CHILDREN, Appellee-Petitioner.
No. 64A05-0003-JV-100.
Court of Appeals of Indiana.
September 14, 2000.
Rehearing Denied October 31, 2000.
*1109 Peter Boyles, Matthew D. Soliday, Valparaiso, Indiana, Attorneys for Appellants.
Theodore A. Fitzgerald, Petry & Fitzgerald, Hebron, Indiana, Attorney for Appellee.

*1108 OPINION
BARNES, Judge

Case Summary
Brenda Phelps and Elvis Pack, the natural parents of 6-year-old A.P., seek review of the involuntary termination of their parental relationship with A.P. entered by the Porter Juvenile Court on December 17, 1999. We reverse.

Issues
Appellants presented three issues for our review, but because of our disposition of the case we consider only the two following restated issues:
1. whether Marcia Gienapp was properly appointed "temporary judge" of the Porter Juvenile Court on the date the termination hearing was held; and
2. whether Appellants' due process rights were violated because they were not provided with case plans concerning A.P. and because the termination petition did not comport with the statutory requirements for such petitions.

Facts
Brenda and Elvis are the natural parents of five boys, of whom A.P. is the youngest; Brenda also has a son by her former husband. The record reflects that appellee Porter County Office of Family and Children ("PCOFC") first became officially involved in the lives of Brenda and Elvis in February 1995, when juvenile court approval for a program of informal adjustment was sought unsuccessfully. PCOFC then filed a children in need of services ("CHINS") petition concerning A.P. and his brothers on June 21, 1995, which did not request the children's removal from their home. The trial court conducted an initial hearing on July 18, 1995, when it was determined that A.P. and his brothers were CHINS after Brenda admitted the allegations in the CHINS petition and Elvis failed to appear, because he was apparently incarcerated. A formal "Dispositional Hearing Order" was entered on September 19, 1995, which did not remove A.P. and his brothers from the home.
At a status hearing on February 21, 1996, the juvenile court entered an order stating simply that "[c]hildren are placed in Foster Care." This order was unaccompanied by any written findings and was apparently entered pursuant to the recommendation of the court appointed special advocate, ("CASA") even though it conflicted with PCOFC's recommendation in its written report to the court that the children remain in the home with Brenda and Elvis for the time being. Following several "status" and "review" hearings, PCOFC filed its first petition to terminate Brenda's and Elvis' parental rights with respect to A.P. on January 21, 1997. This petition also sought to terminate their parental rights with respect to their second youngest son, R.P., as well, and the trial court did not conduct a hearing or take any other action on the petition, aside from eventually continuing a hearing date on the petition without setting a new hearing date.
*1110 The CHINS proceedings continued, with review hearings being held at least every six months. For most of this time, Elvis was incarcerated for various reasons; most of his incarceration during the relevant time period was due to a probation revocation on a habitual traffic offender conviction. In early 1999, the PCOFC expressed its desire to "reactivate" the two-year old termination petition with respect to A.P. A termination hearing was originally scheduled for April 6, 1999, but it was continued to June 1, 1999. In the meantime, the PCOFC filed another termination petition; this one only sought to terminate Brenda's and Elvis' parental rights with respect to A.P., as opposed to the 1997 petition that included R.P.
At the June 1 hearing, Brenda's and Elvis' attorneys challenged the authority of Marcia Gienapp, who had been serving as "magistrate pro tem" in A.P.'s CHINS proceedings for approximately two years, to conduct the termination hearing. Specifically, counsel were unaware of any court order appointing Gienapp to that position. The termination hearing was again continued so that the joint motion to disqualify Gienapp could be briefed. Brenda and Elvis each filed memoranda focusing on the appointment of special judges and judges pro tempore under Indiana Trial Rules 63, 76, and 79. The motion to disqualify was denied on the basis that the appropriate authority to serve as "magistrate pro tem" had been granted to Gienapp by an order signed by the regular Porter Circuit Court Judge, the Honorable Mary Harper, because of a conflict of interest of the regular Porter Circuit Court magistrate. No copy of that order is in the record. Interestingly enough, Gienapp signed the order denying the motion to disqualify as "temporary judge," which is the first order in the record that Gienapp signed in that capacity as opposed to "magistrate pro tem."
After another continuance, the trial court conducted a termination hearing on December 14, 1999. Gienapp, who had been appointed "Temporary Judge in Porter Juvenile Court" for that day by Judge Harper, presided over the hearing. The trial court heard testimony from psychologists, social workers, PCOFC caseworkers, and Brenda and Elvis. The trial court terminated their parental rights with respect to A.P. on December 17, 1999, after concluding that A.P. had been removed from his parents for more than six months under a dispositional decree, that there was a reasonable probability that the conditions that resulted in his removal and the reasons for his out-of-home placement would not be remedied, that continuation of the parent-child relationship posed a threat to A.P.'s well-being, termination was in A.P.'s best interests, and there was a satisfactory plan for A.P.'s care and treatment. This appeal ensued.

Analysis

I. Temporary Judge Appointment
We must initially address the question of whether Marcia Gienapp was properly appointed "Temporary Judge" of the Porter Juvenile Court on December 14, 1999. If the appointment was improper, the record before us would be devoid of an appealable final order of judgment because the criteria and the procedure for the appointment of temporary judges are non-discretionary. See Beach v. Beach, 604 N.E.2d 656, 658-59 (Ind.Ct.App.1992).
The statutory requirements for the appointment of temporary judges are set forth at Indiana Code Section 33-13-16-1, which provides as follows:[1]
(a) The judge of a circuit, superior, or county court may appoint temporary judges. Each temporary judge must be a competent attorney admitted to the practice of law in Indiana and must be a resident of the judicial district of the *1111 court after the temporary judge's appointment. The temporary judge's appointment must be in writing. The temporary judge continues in office until removed by the judge.
(b) A temporary juvenile law judge may be appointed under this subsection for the exclusive purpose of hearing cases arising under IC 31-30 through IC 31-40. The appointment shall be made under an agreement between at least two (2) judges of courts:
(1) all of which are located in the same county; or
(2) all of which are located in counties that are adjacent to one another.
(c) An agreement under subsection (b) must:
(1) be filed with the circuit court clerk of each county in which a court subject to the agreement is located;
(2) specify the duration of the agreement, which may not exceed one (1) year; and
(3) permit a judge to end the participation of a court in the agreement.
Appellants essentially contend that because Gienapp was appointed to serve as "Temporary Judge in Porter Juvenile Court," subsections (b) and (c) of the above statute had to be complied with. There is no question that the record is devoid of an agreement between two or more judges as contemplated by those subsections.
Nonetheless, we believe Gienapp's appointment to serve as temporary judge was valid pursuant to Indiana Code Section 33-13-16-1(a). That subsection provides broad discretion to regular circuit, superior, or county court judges to appoint temporary judges, as long as the appointment is made via a writing filed before the temporary judge proceeds with the disposition of a case and the other statutory conditions are met. See Beach, 604 N.E.2d at 658-59. Here, Judge Harper made such a written and contemporaneous appointment. Appellants make no claim that Gienapp failed to meet the other requirements of subsection (a): namely, that she was a competent attorney admitted to practice in Indiana who resided in the appropriate judicial district.
We do not believe that subsections (b) and (c) of Indiana Code Section 33-13-16-1 must be satisfied merely because a temporary judge is appointed to serve in a juvenile court. First, Judge Harper, as judge of the Porter Circuit Court, had the power to appoint temporary judges under subsection (a), regardless of the name given to the court in which Gienapp was to serve. Indiana Code Section 33-12-3-1 vests circuit courts with juvenile jurisdiction unless another statute vests another court in that county with exclusive juvenile jurisdiction. Porter County has no separate statutorily-created "juvenile court" and no other court in that county has exclusive juvenile jurisdiction. See IND. CODE § 33-5-38-4. Thus, the Porter Juvenile Court is merely the Porter Circuit Court by another name, and Judge Harper possessed the authority to single-handedly appoint temporary judges in her court.
Second, the order appointing Gienapp as temporary judge of the Porter Juvenile Court did not limit her to hearing cases arising under Indiana Code Articles 31-30 through 31-40. This is an important distinction, because juvenile courts possess exclusive original jurisdiction over paternity proceedings,[2] which arise under Indiana Code Article 31-14, and juvenile courts also possess concurrent jurisdiction (with probate courts) over proceedings to commit children under Indiana Code Article 12-26.[3] Thus, by her general appointment to the Porter Juvenile Court, Gienapp could have heard cases arising outside of Indiana Code Articles 31-30 through 31-40.
Finally, we believe that Indiana Code Section 33-13-16-1(b) merely presents the opportunity for an alternative arrangement for two or more regular judges to collaborate in order to reduce their juvenile *1112 caseload, and a signed agreement between two or more judges is not required unless this alternative arrangement is to be pursued; it is not required whenever a judge wishes to appoint a temporary judge to serve in a juvenile court. Thus, Judge Harper's order appointing Gienapp to serve as temporary judge in the Porter Juvenile Court on December 14, 1999, was valid.

II. Procedural Due Process
Next, Appellants contend that certain statutory requirements were not followed in the CHINS and termination proceedings and therefore their due process rights were violated. The involuntary termination of parental rights is an extreme measure that is designed to be used only as a last resort when all other reasonable efforts have failed. In re B.D.J., 728 N.E.2d 195, 199 (Ind.Ct.App.2000). Choices about marriage, family life, and the upbringing of children are among associational rights the United States Supreme Court has ranked as of basic importance in our society and are rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect. M.L.B. v. S.L.J., 519 U.S. 102, 116-17, 117 S.Ct. 555, 564, 136 L.Ed.2d 473 (1996). A case involving the State's authority to permanently sever a parent-child bond demands the close consideration the Supreme Court has long required when a family association so undeniably important is at stake. Id.
The nature of the process due in parental rights termination proceedings turns on a balancing of the "three distinct factors" specified in Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976): the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure. Santosky v. Kramer, 455 U.S. 745, 754, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599 (1982). Finally, we must keep in mind the general proposition that if the State imparts a due process right, then it must give that right. City of Mitchell v. Graves, 612 N.E.2d 149, 152 (Ind.Ct.App.1993).
Our legislature has enacted an interlocking statutory scheme governing CHINS and the involuntary termination of parental rights designed to protect the rights of parents in raising their children while allowing the State to effect its legitimate interest in protecting children from harm. The CHINS and involuntary termination statutes are not independent of each other. Indiana Code Section 31-35-2-2 clearly states that although termination proceedings are distinct from CHINS proceedings, an involuntary termination proceeding is "governed by the procedures prescribed by" the CHINS statutes contained in Indiana Code Article 31-34. Our supreme court has concluded that CHINS proceedings are "distinct from" involuntary termination proceedings in that a CHINS cause of action is separate from and does not necessarily lead to a termination cause of action. State ex. rel. Gosnell v. Cass Cir. Court, 577 N.E.2d 957, 958 (Ind.1991). Moreover, a CHINS intervention in no way challenges the general competency of a parent to continue a relationship with his or her child, and a termination proceeding is thus of "much greater magnitude as to the rights of the parties involved." Id. Also, an involuntary termination of parental rights can occur only after a child has been removed from his or her parent for six months under a CHINS (or juvenile delinquency) dispositional decree, or after a court has made an express determination that reasonable efforts for family preservation or reunification are not required pursuant to Indiana Code Section 31-34-21-5.6, or after the child has been removed from his or her parent for at least fifteen of the most recent twenty-two months. I.C. § 31-35-2-4. Those three alternative prerequisites to involuntary parental rights termination can only be met through compliance with the CHINS or juvenile delinquency statutes. Thus, procedural irregularities in a CHINS proceedings may be of such import that they *1113 deprive a parent of procedural due process with respect to the termination of his or her parental rights. It would be incongruous to hold that a county, with the assistance of a juvenile court, may commence CHINS proceedings for a child and remove a child from his or her home, yet disregard various portions of the CHINS and termination statutes on several occasions and still terminate parental rights following the passage of time after a CHINS dispositional decree and a child's removal from the home. Cf. Matter of R.R., 587 N.E.2d 1341 (Ind.Ct.App.1992) (failure to follow statutory procedures in connection with filing of CHINS petition, exacerbated by mother's diminished mental capacity, operated to deny mother due process such that CHINS and termination of parental rights judgments were void); Matter of C.M., 675 N.E.2d 1134, 1137-38 (Ind.Ct.App.1997) (mother was not collaterally estopped from relitigating issues related to CHINS proceeding in a subsequent termination proceeding, due in part to significantly different parental interests in the two proceedings).
The first procedural irregularity Appellants raise is the PCOFC's failure to provide them with case plans for A.P. following the CHINS determination. Indiana Code Chapter 31-34-15 governs case plans in CHINS proceedings. Specifically, section 31-34-15-1 provides that such plans are "required for each child in need of services," while section 31-34-15-2 states that the county office of family and children, "after negotiating with the child's parent ... shall complete" a case plan within sixty days of a child's first placement or the date of a dispositional decree, whichever comes first. Finally, section 31-34-15-3 states that a copy of the completed plan "shall be sent to the child's parent" within ten days after it is completed (emphases added).[4] The statutes do not discuss modifications to case plans, but it would defeat the purpose of preparing and providing copies of such plans if they could be subsequently altered unilaterally by a county office of family and children without providing copies of the modifications to the parents.
Before we reach the issue of whether a case plan for A.P. and any modifications thereto were ever provided to Appellants, we question whether such a plan comporting with the statute ever existed. The first purported case plan in the record was prepared by the PCOFC on June 21, 1995, on the same day the CHINS petition for A.P. was filed. The trial court did not enter a CHINS dispositional order for A.P. until September 19, 1995, at which time A.P. was not removed from the home; the next purported case plan was not prepared until December 21, 1995, more than sixty days after the dispositional order was entered. Moreover, there is no indication that any "negotiation" between appellants and the PCOFC took place for any of the nine case plans contained in the record. Each plan contained an "ACKNOWLEDGEMENT/AGREEMENT OF ALL PARTIES" section and was signed by the caseworker, though on every plan the space for the parents' signatures in this section is blank.[5]
Even if these case plans did comport with the statutory requirements, it is clear that not all of them were provided to Appellants; in fact, it is possible that none of them were. As noted, the record contains nine case plans. Apparently, a total of ten were prepared, reflecting modifications made roughly every six months, but one of *1114 the plans was missing from the PCOFC's files.[6] At the termination hearing, Carol Vurva, who was A.P.'s PCOFC case worker for several years, testified that although copies of case plans are "ideally" provided to a child's parents, A.P.'s case plans were "not always" given to Appellants. Brenda and Elvis both testified that they did not recall ever seeing a case plan for A.P. Moreover, the case plans in the record contain a space to indicate the date a copy of the plan was given to the parents; in every plan, that space is blank. Nor were these plans made part of the court's record prior to the termination hearing.
This failure to provide Brenda and Elvis with copies of A.P.'s case plans could have substantially increased the risk of error with respect to the termination of parental rights, in that Appellants may have been deprived of some degree of notice as to what conduct on their part could lead to the termination of those rights. See Alsager v. District Court of Polk Co., Iowa, 545 F.2d 1137, 1137 (8th Cir.1976) (parents were denied procedural due process in that they were not given adequate notice of what conduct allegedly warranted termination of parental rights). We recognize that the original dispositional order and the multiple review hearing orders in this case may have provided some written notice of that conduct.[7] However, the record reflects that the case plans often contained requirements of Brenda and Elvis that were not contained in court orders. In fact, Carol Vurva testified that while the case plans were generally based on court orders, she would place other requirements in them that she believed were necessary. While there is no reason that a case plan may not differ from a court's orders, the existence of such differences heightens the importance of providing copies of the case plan to parents.
Appellants next question the involuntary termination petition filed in this matter. It is clear that the petition does not comport with the statutory requirements for a termination petition. When the petition was filed in May 1999, Indiana Code § 31-35-2-4(b)(2) provided that a petition must allege that:
(A) one (1) of the following exists:
(i) the child has been removed from the parent for at least six (6) months under a dispositional decree; or
(ii) a court has entered a finding under IC XX-XX-XX-X.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made;
(B) there is a reasonable probability that:
(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child....[8]
The petition here contained none of the allegations required by Indiana Code Section 31-35-2-4(b)(2). Again, there is a risk of increased error inherent in this omission, in that Appellants lacked prior notice of the statutory termination provisions *1115 upon which the PCOFC intended to rely at the termination hearing.
In addition to these errors cited by Appellants, our review of the record in addressing those errors revealed no fewer than five additional clear and substantial procedural irregularities.[9] Our supreme court has held that where the interests, rights, and privileges of juveniles are involved, appellate courts may search the record and determine issues inherent therein. Hicks v. State, 249 Ind. 24, 26, 230 N.E.2d 757, 758 (1967). We believe the interests, rights, and privileges of parents facing the permanent severance of ties with their children are equally important. Although we are not required to search the record for errors, we are not so restricted that we must close our eyes to what is clearly before us. Indiana Rev. Bd. v. Hansbrough, 275 Ind. 426, 433, 417 N.E.2d 311, 316, (1981). Finally, it is always the duty of reviewing courts to see that fundamental rights of due process are not improperly denied in any type of action. City of Mitchell v. Graves, 612 N.E.2d 149, 152 (Ind.Ct.App.1993).
The first clear error not specifically raised by appellants is that the CHINS petition forming the basis of the eventual involuntary termination judgment was unsigned and thus unverified. Indiana Code Section 31-34-9-3 (previously section 31-6-4-10(c)) plainly requires that a CHINS petition be verified and signed by a person representing the interests of the State. This requirement helps to ensure the veracity of the allegations supporting such a petition and it also gives clear indication that a representative of the State believes a CHINS proceeding is appropriate at that time.
Second, Indiana Code Section 31-34-21-7 states that a court "shall" hold a "permanency hearing" every 12 months after the date of the original dispositional decree or a CHINS was removed from his or her parent, whichever comes first.[10] The record contains no indication that such a hearing was ever held in this matter. The primary purpose of such a hearing may be to reduce uncertainty and anxiety surrounding a young child's life, from both the child's and parents' perspectives, by requiring production of a "permanency plan" for the child.[11] Furthermore, a court during a permanency hearing "shall ... examine procedural safeguards used by the county office of family and children to protect parental rights." I.C. § 31-34-21-7(b)(6) (previously § 31-6-4-19(c)). No such judicial examination occurred here. Had it taken place, the trial court, for example, might have discovered and taken steps to remedy the PCOFC's failure to provide Appellants with copies of A.P.'s case plans and any modifications thereto.
Next, we address the adequacy of the CHINS dispositional decree entered by the trial court, as well as the order fundamentally modifying that decree when A.P. and his brothers were placed in foster care. Indiana Code Section 31-34-19-10(5) (formerly section 31-6-4-15.3(i)(5)) provides that a court "shall accompany [its] dispositional decree with written findings and conclusions upon the record concerning... [t]he court's reasons for the disposition." No such reasons of any kind accompanied the lower court's initial dispositional decree in this matter on September 19, 1995, nor was any written reasoning provided for the children's subsequent out-of-home placement on February 21, 1996; the only statement in the lower *1116 court's order regarding foster care was that "[c]hildren are placed in Foster Care."[12] Record p. 69.
We believe that in order to give effect to the CHINS statutory scheme, written findings and conclusions on the record concerning the court's reasons for modifying a dispositional decree are required just as they are for an original decree, particularly where that modification results in an out-of-home placement of a child. An out-of-home placement constitutes a significant alteration in the nature of a CHINS proceeding, because it increases the gravity of the situation and, as a result, logically indicates that it increases the possibility of a subsequent termination of parental rights. For purposes of the element of the involuntary termination statute requiring a child to have been "removed from the parent for at least six (6) months under a dispositional decree" before termination may occur, I.C. § 31-35-2-4(b)(2)(A)(i), such a dispositional decree is one that authorizes an out-of-home placement. Tipton v. Marion Co. Dept. of Pub. Welfare, 629 N.E.2d 1262, 1265-66 (Ind.Ct.App.1994). An omission of written findings concerning a court's reasoning for an out-of-home placement may have a substantial impact in a subsequent termination proceeding. Here, the involuntary termination judgment relied in part upon a conclusion that "there [was] a reasonable probability that the conditions that resulted in the child's removal and the reasons for his placement outside his parent's home will not be remedied." Supp. record p. 3. However, with no written findings on the record indicating what those reasons were, the concern of whether a parent has had sufficient notice of conduct that will lead to a termination of parental rights surfaces again.
The final two irregularities pertain to Elvis. On August 8, 1997, the court restrained Elvis from having any contact with his children. This no-contact order was later dissolved but then was reinstated on March 3, 1998. This order remained in full force and effect until September 10, 1999, when it was modified to allow for family counseling sessions and supervised visitation. At no time, prior to the August 8 or March 3 hearings, did either the CASA or the PCOFC request such an order by means of a verified petition comporting with the requirements of Indiana Code Sections 31-34-17-2 and -3 for the issuance of protective orders in a CHINS proceeding. In fact, in the reports to the court filed by the CASA and the PCOFC before each of the hearings, there is no mention of the need for a no contact order against Elvis. Additionally, despite the fact that a court is required to find, inter alia, that the best interests of the child would be served if a person refrained from direct or indirect contact with the child before it issues a protective order pursuant to Indiana Code Section 31-34-17-4, the trial court in this case never provided a basis for the orders. It is unclear what harm might have befallen A.P. if Elvis was allowed to contact him. During the time the orders were in effect, Elvis was incarcerated and thus could not have posed a physical threat to A.P., and we can find no indication in the record that Elvis was verbally threatening A.P. from prison. There may have been other reasons for issuing the orders but the trial court has not provided us with a finding on the record that supports those orders. While we cannot speculate whether Elvis would *1117 have maintained contact with A.P. from prison but for the no-contact orders, they effectively precluded that opportunity altogether and thus could have contributed to A.P.'s estrangement from Elvis.[13]
As noted, Elvis was incarcerated for most of the relevant time period in this case. Nevertheless, he had a right to be present at the review hearings in A.P.'s CHINS proceedings pursuant to Indiana Code Section 31-34-21-4(b), which states that a court "shall provide" parents "an opportunity to be heard and to make any recommendations to the court in a periodic case review ...." (emphasis added). On at least two occasions Elvis was deprived of this right. The first was on March 8, 1998, when the second no-contact order against Elvis was entered. Although Elvis had previously notified the court, pro se, that he wished "to be present at ANY and ALL hearings involving my children," Record p. 191, and although a transport order was issued to secure his presence on March 8, 1998, for reasons that are unclear Elvis was in fact not transported on that date. Upon learning of this hearing and its results, Elvis immediately again wrote the court pro se, questioning why he was not permitted to attend the hearing. A few months later, Elvis, still acting pro se, moved that a hearing be set to address the no-contact order against him and accompanied that request with a motion for a transport order. The trial court subsequently set a hearing date for August 4, 1998, technically in response to a request by the PCOFC, but denied Elvis' motion for a transport order in violation of his right to be present at that hearing, at which time the no-contact order was reaffirmed.[14]
In sum, the following errors have contributed to a deprivation of Brenda's and Elvis' due process rights concerning the termination of their parental rights with respect to A.P.: (1) the PCOFC admittedly failed to provide Brenda and Elvis with copies of at least some, and possibly all, of A.P.'s case plans as required by Indiana Code Chapter 31-34-15; (2) the termination petition filed in this cause did not comport with the requirements of Indiana Code Section 31-35-2-4; (3) the original underlying CHINS petition filed with respect to A.P. was unsigned and unverified in violation of Indiana Code Section 31-34-9-3; (4) no permanency hearing was ever held as required by Indiana Code Section 31-34-21-7; (5) the original CHINS dispositional order, the modification of that order providing for A.P.'s out-of-home placement, and every other order entered by the trial court, with the exception of the termination judgment, contained no written findings and conclusions upon the record concerning its reasons for those dispositions as required by Indiana Code Section 31-34-19-10; (6) the trial court entered a no-contact order against Elvis without following the statutory prerequisites for entry of such an order as contained in Indiana Code Chapter 31-34-17; and (7) Elvis was deprived, on at least two occasions, of his right to be present at review hearings in A.P.'s CHINS case in violation of Indiana Code Section 31-34-21-4(b). In considering the Mathews v. Eldridge due process factors under these circumstances, we first note that in parental rights termination proceedings, the private interest affected is commanding. Santosky v. Kramer, 455 U.S. 745, 758, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). Second, there is no apparent governmental *1118 interest that would justify a disregard of procedures set forth by our legislature; rather, those procedures must be followed, especially when such an important private interest is at stake. Third, although we are not convinced that any one of the above irregularities by itself substantially increased the risk of error in the termination proceeding to the extent that appellants were deprived of due process, there is such an inherent increased risk of error because of the multiplicity of procedural irregularities.
The case before us today has presented different issues for our resolution than those we considered recently in the involuntary termination case of In re B.D.J., 728 N.E.2d 195 (Ind.Ct.App.2000), wherein this Court considered the sufficiency of the evidence supporting a finding that the conditions leading to the children's removal from their father would not be remedied. There, in addressing the father's contention that the county department of family and children ("DFC") had failed to provide services to him, we held that "while a participation plan serves as a useful tool in assisting parents in meeting their obligations,... termination of parental rights may occur independently of them, as long as the elements of Ind.Code § 31-35-2-4 are proven by clear and convincing evidence." Id. at 201. We also noted that the father had sat "idly by" and never sought services from the DFC and thus he could not argue he had been improperly denied services. Id. Thus, In re B.D.J. did not address the impact that procedural irregularities in CHINS and termination proceedings may have on a parent's due process rights.
Here, we are not commenting upon the sufficiency of the evidence in this case or the extent to which a county office of family and children must provide services to parents of a CHINS.[15] However, we cannot ignore that the trial court and the PCOFC failed to follow statutory mandates in this matter. By our holding we are not adding an additional element to those that an agency seeking to terminate parental rights must prove by clear and convincing evidence. Those elements are set forth in Indiana Code Section 31-35-2-4 and are exclusive. See S.E.S. v. Grant Co. Dept. of Welfare, 594 N.E.2d 447, 448 (Ind.1992). However, when, as here, a record is replete with procedural irregularities throughout CHINS and termination proceedings that are plain, numerous, and substantial, we are compelled to reverse a termination judgment on procedural due process grounds.

Conclusion
At this time we are only reversing the termination of parental rights judgment entered in lower court cause number 64C01-9905-JT-410. The orders entered in the underlying CHINS proceeding for A.P., lower court cause number 64C01-9502-JC-86, will remain in effect. The resolution of this case does not preclude future consideration of Brenda's and Elvis' conduct predating the now-void termination judgment.[16] However, because termination of parental rights is such a serious matter, we insist that the procedural mandates of the CHINS and involuntary termination statutes be followed strictly. Here, the record reveals the filing *1119 of an unsigned and unverified CHINS petition, no issuance of an original or modified dispositional decree containing the requisite written findings, a failure to provide A.P.'s parents with copies of his case plan and its modifications, no holding of a permanency hearing to examine whether the parents' procedural rights were being safeguarded, non-compliance with the protective order statute, a failure to ensure that the parents were present at all hearings, and a termination petition that did not contain the necessary allegations.
Reversed.
BAILEY, J., and RILEY, J., concur.
NOTES
[1] Initially, we note that the appointment of special and pro tempore judges is governed by the Indiana Trial Rules, as briefed by Appellants at the trial court level. The above statute governs temporary judge appointments.
[2] See I.C. § 31-30-1-1(3).
[3] See I.C. § 31-30-1-5(1).
[4] The case plan requirements were previously codified at Indiana Code Section § 31-6-4-6.6. The Indiana Juvenile Code underwent a recodification that became effective on July 1, 1997, during the midst of the underlying CHINS proceeding in this case. The prior code sections will be noted in this opinion where a relevant event took place prior to July 1, 1997. Although most of the changes made to the Code were merely numerical recodifications, we will note any relevant substantive modifications.
[5] We recognize the difficulty of meeting this requirement while Elvis was incarcerated, but there is no reason this could not have been done each time with Brenda.
[6] We are also troubled by the fact that Brenda had requested, prior to the termination hearing, that the PCOFC produce a copy of A.P.'s case plan and any additions, corrections, or modifications to the plan, but the PCOFC only produced the most recent modified plan prior to the hearing. The other eight plans the PCOFC had in its files were not produced until after the hearing began.
[7] The dispositional and review orders contained certain directives the parents were to follow; however, they contained no written findings, which creates another procedural problem as discussed later in this opinion.
[8] Indiana Code Section 31-35-2-4(b)(2)(A)(iii) now provides that a termination petition may allege that a child has been removed from the parent and placed in the county's care for at least fifteen of the most recent twenty-two months.
[9] While these errors were not specifically raised by appellants in their brief as part of their due process claim, some of them were otherwise brought to our attention in the brief.
[10] Prior to the 1997 recodification, the substantial equivalent of such a hearing was not officially named a "permanency hearing," and it was to be held every eighteen months, not every twelve. (The prior codification was at Indiana Code Section 31-6-4-19(c).)
[11] We note that A.P. has now been a CHINS for nearly five years and has been in foster care for approximately four and one-half of the six years of his life.
[12] In fact, in the four and one-half years between the filing of the CHINS petition and the entry of the termination of parental rights judgment, the lower court apparently never made any written findings on the record in connection with any of the numerous orders it issued. Indiana Code Section 31-34-21-5 (previously section 31-6-4-19(b)) requires a court to make written findings in connection with a six-month review hearing order. It is particularly relevant to the case at bar, given the uncertainty surrounding the PCOFC's case plans for A.P. discussed earlier, that a court in such a review hearing is to determine the "extent to which the child's parent ... has been given the opportunity to participate in case planning...."
[13] The lower court's finding number 9 states that "[A.P.] does not know his father."
[14] Furthermore, in its "Review Hearing Order" from August 4, 1998, the court stated that "[f]ather fail[ed] to appear after proper notice was served." (266) It is unclear how he could have attended the hearing after the transport order was denied. It is also curious that although this order was purportedly prepared by the "magistrate pro tem" on August 4, 1998, the regular Porter Juvenile Court judge's approval of the order is dated July 28, 1998. (270) There are other instances in the record where approval of the "magistrate pro tem"'s orders apparently predated preparation of the orders themselves.
[15] We do note, however, that our legislature has increased the burden on offices of family and children to provide family services in a CHINS proceeding through two 1998 statutory amendments. Indiana Code § 31-34-21-5.5 states that a county office of family and children "shall make reasonable efforts to preserve and reunify families" except in certain extreme cases. Also, Indiana Code Section 31-35-2-4.5(d)(2) and (3) provide that a petition to involuntarily terminate a parent-child relationship may be dismissed under certain circumstances if it is established by a preponderance of the evidence that a county office of family and children has not provided family services in accordance with a statutorily-required CHINS case plan.
[16] In a termination proceeding, a trial court must consider the parent's habitual patterns of conduct as a means of determining the probability of future detrimental behavior. In re B.D.J., 728 N.E.2d 195, 201 (Ind.Ct.App. 2000).