**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEYS FOR APPELLANT:

**RUTH JOHNSON**
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**DAVID E. COREY**
Deputy Attorneys General
Indianapolis, Indiana



FILED
Nov 24 2014, 9:36 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of R.O., Minor Child, and J.T., Father, and M.O., Mother,[1] <br><br> J.T., <br><br>     Appellant-Respondent, <br><br>        vs. <br><br> INDIANA DEPARTMENT OF CHILD SERVICES, <br><br>     Appellee-Petitioner. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. 49A02-1404-JT-249<br>)<br>)<br>)<br>)<br>) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Gary K. Chavers, Judge Pro Tempore
The Honorable Larry E. Bradley, Magistrate
Cause No. 49D09-1308-JT-16182

November 24, 2014
**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

---

[1] We note that M.O. did not file an appeal in this case. However, "[u]nder Indiana Appellate Rule 17(A), '[a] party of record in the trial court or Administrative Agency shall be a party on appeal.'" *Hoosier Outdoor Adver. Corp. v. RBL Mgmt., Inc.*, 844 N.E.2d 157, 162 (Ind. Ct. App. 2006) (quoting Ind. Appellate Rule 17(A)), *trans. denied*.

J.T. ("Father") appeals the juvenile court's order terminating his parental rights to his child, R.O. He raises the following restated issues for our review:

I.      Whether Father's due process rights were violated during the underlying proceedings; and

II.     Whether sufficient evidence was presented to support the termination of Father's parental rights.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On May 30, 2012, the Marion County office of the Indiana Department of Child Services ("DCS") filed a petition alleging that R.O. ("Child") was a Child in Need of Services ("CHINS") based on Child having no legal caregiver because Child's guardian, maternal grandmother, had been arrested.[2] Father, who at the time was the alleged father, was incarcerated with an expected release date in 2036. M.O. ("Mother") did not have custody of Child and had been recently released from prison for a drug-related conviction. The petition also alleged that maternal grandmother's home was unfit and had no electricity.

At the time of the CHINS petition and at all relevant times during the CHINS and termination proceedings, Father was incarcerated. He had been incarcerated since around the time of Child's birth, which occurred on October 28, 2011. On March 10, 2011, Father was charged with Class B felony battery, Class D felony battery, and Class A felony burglary. On November 4, 2011, he was convicted of Class A felony burglary and

---

[2] The CHINS petition and subsequent termination order also included M.O.'s other two children, K.T. and K.O., who are Child's half-siblings. M.O. does not participate in this appeal, and therefore, we only include facts regarding her and her other children as is necessary to address Father's arguments.

sentenced to fifty years executed in the Department of Correction ("the DOC"). Father's earliest release date is in 2036. Father has an extensive criminal history consisting of three misdemeanor convictions and five felony convictions dating back to 1996. Father has never met Child and has only seen pictures of her. Prior to the CHINS filing, he provided for Child financially "as [he] was able to." *Tr.* at 26.

Due to his incarceration, Father did not appear at the initial hearing on May 30, 2012, at which the juvenile court authorized Child's placement with R.T., the paternal grandmother of Child's half-siblings, and the juvenile court set the matter for an additional hearing. At the June 15, 2012 pretrial hearing in the CHINS case, Father did not appear but was represented by private counsel who entered a denial on Father's behalf. At the July 6, 2012 pretrial hearing, Father appeared by counsel and requested DNA testing since Father had not yet established paternity. The juvenile court ordered paternity testing be done. At the July 20, 2012 pretrial hearing, Father, by counsel, entered a stipulation that, "[Father] is currently incarcerated and unable to care for the child. Therefore the coercive intervention of the Court is necessary to ensure the safety and well-being [of] the child." *Pet'r's Ex.* 6 at 25. On July 27, 2012, the juvenile court adjudicated the Child to be a CHINS. In the dispositional order, the juvenile court did not order services for Father because he was incarcerated and not expected to be released until 2036.

Father wrote to DCS in early 2013 to inform the agency that if his paternity was established, he wanted to have Child placed in his business partner's home with Father's other daughter, who was then eighteen years old. DCS informed Father that, without paternity being established, Father had no say in Child's placement. On January 11, 2013, a swab was taken from Father for paternity testing. At the August 9, 2013, permanency

3

hearing, the juvenile court noted that DNA testing had still not been completed on Child. Child was tested on August 19, 2013, and a DNA test report issued on August 21, 2013, established that Father was the biological father of Child.

On August 15, 2013, DCS filed a petition to terminate Father's parental rights to Child. At the termination hearing, Father said that he had not been informed "by any court or any institution" that paternity had been established. *Tr.* at 23. However, he did testify that Child's maternal grandmother told him that paternity had been established in him. *Id.* DCS case manager Sher'ron Anderson ("FCM Anderson") testified that she did not inform Father about the paternity results because she had no reason to believe that Father's counsel would not tell him. *Id.* at 79. At the time of the termination hearing, Child was two years old and had placement in the home of R.T. During the underlying CHINS proceeding, Child had changed placement several times, but had been in the home of R.T. since May 2013. Child was very attached to her half-siblings, who also lived with R.T. R.T. lived with her twenty-six-year-old son, Ra. T. They both planned to adopt Child and her siblings. R.T. wanted her son to adopt jointly with her because of her health, and she did not want to worry about the children being removed again. *Id.* at 15.

FCM Anderson testified that it was not in Child's best interest to be moved from R.T.'s home because Child was bonded with her siblings and with R.T. and Ra. T. and "she loves it there." *Id.* at 60. DCS's plan for Child was adoption, and FCM Anderson recommended that parental rights be terminated so Child could be adopted. *Id.* at 59. The Guardian Ad Litem ("GAL") agreed with the permanency plan of adoption. She did not agree that Ra. T. should solely adopt Child, and without him first being more involved in the case, she did not recommend termination. *Id.* at 102-03. The GAL stated she would

4

be satisfied if only R.T. adopted Child, and that in the future it was possible she would support R.T. and Ra. T. co-adopting Child. *Id*. at 103, 115-16. FCM Anderson testified that DCS supported adoption by both R.T. and Ra. T. *Id*. at 61. There had been concerns regarding Ra. T. adopting Child because of his prior use of physical discipline on one of Child's older siblings. Ra. T. had spanked the older sibling with his hand when the child struck R.T. in the face with a closed fist. Background checks done by DCS did not reveal any inappropriate conduct of Ra. T., and DCS put a safety plan in place for all the caregivers who would be taking care of Child and her siblings.

On March 17, 2014, the juvenile court issued it order terminating Father's parental rights to Child. Father now appeals.

## DISCUSSION AND DECISION

### I. Due Process

The Due Process Clause of the U.S. Constitution prohibits state action that deprives a person of life, liberty, or property without a fair proceeding. *In re B.J.*, 879 N.E.2d 7, 16 (Ind. Ct. App. 2008), *trans. denied*. Parental rights constitute an important interest warranting deference and protection, and a termination of that interest is a "unique kind of deprivation." *Lassiter v. Dep't of Soc. Servs.,* 452 U.S. 18, 27 (1981). However, children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships. *Lehman v. Lycoming Cnty. Children's Servs. Agency,* 458 U.S. 502, 513 (1982). When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. *In re B.J.*, 879 N.E.2d at 16.

Due process in parental-rights cases involves the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing government interest supporting the use of the challenged procedure. *S.L. v. Ind. Dep't of Child Servs.,* 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013) (citing *In re C.G.,* 954 N.E.2d 910, 917 (Ind. 2011) (citing *A.P. v. Porter Cnty. Office of Family & Children,* 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000), *reh'g denied, trans. denied.*)). The private interests affected by the proceeding, a parent's interest in the care, custody, and control of his or her child, is substantial, and the State's interest in protecting the welfare of a child is also substantial. *Id.* "Because the State and the parent have substantial interests affected by the proceeding, we focus on the risk of error created by DCS's actions and the trial court's actions." *Id.* Any procedural irregularities in a CHINS proceeding may be of such significance that they deprive a parent of procedural due process with respect to the termination of his or her parental rights. *Id.* Nevertheless, a parent may waive a due process claim in a CHINS or termination proceeding by raising that claim for the first time on appeal. *Id.*

Father argues that several procedural irregularities occurred throughout the CHINS and termination proceedings that denied him a meaningful opportunity to be heard regarding Child's fate. He first contends that he was not given notice of the initial hearing. He next claims that the fact that, in the CHINS finding, the juvenile court ordered that he receive no services due to his incarceration was a violation of his due process rights. He further asserts that DCS had no contact with him during the proceedings. Lastly, Father alleges that DCS failed to establish paternity in a timely manner, and together with DCS's policy of not allowing putative fathers to participate in the proceedings, it effectively

6

deprived him of the having a voice in the CHINS proceedings. Father argues that these procedural irregularities establish that he was denied a meaningful opportunity to be heard during the proceedings and created a "huge risk of error in this case." *Appellant's Br*. at 19. Due to the irregularities, Father further asserts that his ability to prove to the juvenile court that he should remain a part of Child's life was severely compromised.

As to Father's argument that he was not provided notice of the initial hearing, we note that Father did not raise this issue in either the CHINS or termination proceedings. A parent may waive a due process claim in a CHINS or termination proceeding by raising that claim for the first time on appeal. *S.L.*, 997 N.E.2d at 1120. Waiver notwithstanding, Father has not shown how he was harmed by not being notified of the initial hearing. An initial hearing was held on May 30, 2012, where the juvenile court authorized Child's placement with R.T and set the matter for an additional hearing on June 15, 2012. At the June 15 hearing, Father's counsel appeared on his behalf and entered a denial of the CHINS allegations. Father has shown no harm resulting from not being notified of the May 30 initial hearing as the hearing was continued to June 15, and he was represented by counsel on that hearing date.

Father's second contention is that it was a due process violation that, in the CHINS finding, the juvenile court ordered that he not receive services. He argues that he was excluded "from the services deemed critical in overcoming CHINS determinations and [in] preventing efforts to terminate parental rights." *Appellant's Br*. at 14. Father does not point to where, in the record, he raised this issue with the juvenile court during the underlying proceedings; therefore, the issue is waived. Waiver notwithstanding, "a failure to provide services does not serve as a basis on which to directly attack a termination order

7

as contrary to law." *In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009) (citing *In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000)). Further, one of the reasons Child was adjudicated a CHINS was Father's incarceration and inability to care for Child, necessitating the coercive intervention of the court. Father was incarcerated for the duration of the underlying proceedings and did not have a release date until 2036. Father cites to no services that would have assisted with this situation, nor has he shown that he independently entered into services provided by the DOC, if any, that may have alleviated this issue.

Father's next argument is that DCS had no contact with him throughout the CHINS and termination proceedings. The record shows that FCM Anderson took over as the case manager sometime in September or October 2013. At some point after taking over the case, she wrote Father a letter informing him she was the new case manager and asking him to contact her with any questions or concerns. There was nothing in the record to indicate that Father ever responded to this letter or ever wrote any of the case managers during the proceedings. Father did not call the prior DCS case managers to testify and did not request a copy of FCM Anderson's letter. FCM Anderson testified that neither Father nor his business partner directly contacted her regarding placement of Child. *Tr*. at 59-60. The record does not support Father's argument that this alleged lack of contact caused a risk of error in this case.

Father's final contention is that the delay in establishing paternity violated his due process rights because until paternity was established he was not able to make recommendations as to placement of Child. We reject this contention. First, the statutes governing termination of parental rights do not require an adjudication of paternity prior to

8

the termination of parental rights. *In re D.Q.*, 745 N.E.2d 904, 911 n.4 (Ind. Ct. App. 2001). Here, the juvenile court ordered DNA testing on July 6, 2012 in the CHINS proceeding. Father was tested on January 11, 2013, and Child was tested on August 9, 2013. FCM Anderson testified that the delay in Child getting tested was due to her placement with a cousin who did not get her tested. *Tr.* at 71.

Second, although Father indicated that he informed DCS of his preference for Child's placement and his attorney told him that he had no legal right to request placement for Child without first establishing paternity, at the June 15, 2012 pretrial hearing, Father's counsel and his business partner appeared and informed the juvenile court that Father wanted Child placed with his business partner. Therefore, even before paternity was established, Father was able to notify the juvenile court of his preference for placement of Child, and the court considered the evidence and Child's best interest and ordered alternative placement. Father cannot show harm due to the delay in establishing paternity.

Further, no matter where Child was placed, with R.T. or with Father's choice, it would not have precluded the termination of Father's parental rights. DCS is only required to establish that there is a satisfactory plan for the care and treatment of the child in termination proceedings. *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009). This court has held that adoption is a satisfactory plan for the care and treatment of a child under the termination of parental rights statute. *Id.* DCS presented adoption as the satisfactory plan for Child's care, and placement with a particular person would not have precluded the termination of Father's parental rights.

We conclude that nothing in the record supports Father's argument that his due process rights were violated. He has not shown there was any risk of error created by the

State's chosen procedure. Although Father argues that these alleged procedural irregularities denied him a right to due process, most, if not all, of the issues were due to Father's incarceration. "[T]his court has recognized that '[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children.'" *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006) (quoting *In re A.C.B.,* 598 N.E.2d 570, 572 (Ind. Ct. App. 1992)), *trans. denied*.

## II. Sufficient Evidence

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re B.J.*, 879 N.E.2d at 14. When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re B.J.*, 879 N.E.2d at 14.

Here, in terminating Father's parental rights to Child, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains

no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

(i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child; and

(D)    that there is a satisfactory plan for the care and treatment of the child.

11

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

Father argues that the juvenile court erred in terminating his parental rights because DCS failed to prove by clear and convincing evidence that termination was in the best interests of Child. He contends that the evidence presented did not support the juvenile court's finding that permanency considerations justified termination of Father's parental rights. He alleges that questions existed as to whether adoption by R.T. and Ra. T. was in Child's best interests because the GAL did not support such a placement. Because of these concerns about adoption by R.T. and Ra. T., Father asserts that the evidence was not sufficient to support the termination of his parental rights.

Initially, to the extent that Father contends that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of Child, Father has waived such argument. Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S.*, 987 N.E.2d at 1156. The juvenile court found both that there was a reasonable probability that the conditions that resulted in the removal of Child would not be remedied and that the continuation of the parent-child relationship posed a threat to Child's well-being. Because Father does not raise any argument that there was insufficient

evidence to support the conclusion that the conditions that resulted in the removal of Child and continued placement outside her home would not be remedied, he has waived any argument that DCS did not prove the elements under Indiana Code section 31-35-2-4(b)(2)(B), since it is written in the disjunctive. As the juvenile court found both in this case, and Father only challenges one of the requirements, he implicitly concedes that DCS proved the other element by clear and convincing evidence.

Father's next argument is that insufficient evidence was presented to prove that termination was in the best interests of the child. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d at 267), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). The trial court need not wait until the child is irreversibly harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests. *Id.* (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

Here, the record reflects that Father has never personally provided care for Child, nor has he personally met Child. He had been convicted of his burglary charges on November 11, 2011, about two weeks after Child was born, and was then sentenced to fifty

13

years in the DOC. Prior to this conviction, Father had an extensive criminal history. Child was only about seven months old at the time of her May 30, 2012 removal and has been in at least three different placements since DCS became involved. Father was in no position to personally care for Child. Father admits that he "obviously cannot care for [Child] himself, in light of his lengthy incarceration." *Appellant's Br*. at 25. At the time of the termination hearing, Child was placed with R.T. and Ra. T. where she had stability and safety. Child was also in placement with her half-siblings, to whom she was very attached.

Although the GAL did not agree with DCS as to who should adopt Child, the GAL did agree with the permanency plan of adoption. *Tr*. at 115. FCM Anderson testified that she did not believe it was in Child's best interest to be moved from her current home because Child was bonded with her siblings and with R.T. and Ra. T. and "she loves it there." *Id*. at 60. At the time of the termination hearing, Child had been with R.T. and Ra. T. for almost a year.

It appears that the crux of Father's argument is that he wanted to be able to choose who adopts Child. However, as set forth above, this was not an issue before the juvenile court in the termination proceeding because placement with a particular person would not have precluded the termination of Father's parental rights. DCS is only required to establish that there is a satisfactory plan for the care and treatment of the child in termination proceedings. *In re B.M.*, 913 N.E.2d at 1287. This court has held that adoption is a satisfactory plan for the care and treatment of a child under the termination of parental rights statute. *Id*. Therefore, as DCS presented adoption as the satisfactory plan for Child's care, Father's argument fails. We conclude that sufficient evidence was presented to prove that termination of Father's parental rights was in the best interests of Child.

We will reverse a termination of parental rights "only upon a showing of 'clear error'--that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)).  Based on the record before us, we cannot say that the juvenile court's termination of Father's parental rights to Child was clearly erroneous.  Further, Father's arguments are merely a request for us to reweigh the evidence and judge the credibility of the witnesses, which we cannot do on appeal.  *In re D.D.*, 804 N.E.2d at 265.  We therefore affirm the juvenile court's judgment.

Affirmed.

BAKER, J., and ROBB, J., concur.