## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 21 2018, 9:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Anna Onaitis Holden
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of A.K. (Minor Child)

and

V.K. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

June 21, 2018

Court of Appeals Case No.
18A-JT-83

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge
The Honorable Larry Bradley, Magistrate

Trial Court Cause No.
49D09-1704-JT-351

**Bradford, Judge.**

# Case Summary

[1] V.K. ("Father") appeals the juvenile court's order terminating his parental rights to A.K. ("the Child"). At all times relevant to this appeal, Father worked as a semi-truck driver and was away from home for multiple days at a time. While Father was away from home, the Child was left in her mother's care. The Indiana Department of Child Services ("DCS") became involved in the Child's life after receiving reports of an incident involving the Child's mother. The Child was subsequently determined to be a child in need of services ("CHINS") and Father was ordered to complete a parenting assessment as well as any services deemed necessary. Father, however, failed to complete the parenting assessment or participate in services.

[2] DCS filed a petition seeking the termination of Father's parental rights to the Child on April 5, 2017. Following an evidentiary hearing, the juvenile court issued an order granting DCS's petition. On appeal, Father argues that DCS violated his due process rights by failing to offer him services aimed at reunification. Concluding otherwise, we affirm.

# Facts and Procedural History

[3] Father and H.K. ("Mother") are married and are the biological parents of the Child, who was born on December 15, 2014.[1] At all times relevant to this appeal, Father was employed as a truck driver. As a result of his employment, Father was often absent from home for days and weeks at a time. While Father was away from home, Mother was the Child's primary caregiver.

[4] DCS Family Case Manager ("FCM") Chijuana Lockridge became involved with the Child in November of 2015, after receiving reports of (1) a domestic disturbance involving Mother and (2) potential drug or alcohol use by Mother. DCS filed a petition alleging the Child was a CHINS on November 3, 2015. Father was not named on this petition because DCS did not initially know that he was the Child's father. In March of 2016, DCS first learned that Father was the Child's father after Mother informed DCS that she was married; the individual that DCS initially believed to be the Child's father was not the Child's father; and that her husband, Father, was the Child's father. DCS then amended the CHINS petition to include Father.

[5] Father appeared before the juvenile court for the first time on March 3, 2016. At this time, Father informed FCM Lockridge that "he was not present at the time of the incident and that he is always on the road driving and that he's never really home and that [Mother] has friends over to the house from time to

---

[1] Mother's parental rights to the Child were previously terminated and Mother does not participate in this appeal.

time and he doesn't know who those friends are." Tr. Vol. II, p. 24. FCM

Lockridge also spoke to Father about potential services, explaining

> that if there was a need for any assistance with housing, there's home-based case management. There's home-based therapy for the family, the visitations in the supervised setting, if there were any substance abuse issues we have random screens and IOP that can be referred. And, any other services that he felt he needed as a parent that he would be able to benefit from.

Tr. Vol. II, p. 40. FCM Lockridge attempted to impress upon Father the

importance of services. Father, however, informed her that "he was always on

the road and wouldn't be able to complete services." Tr. Vol. II, p. 25. FCM

Lockridge asked Father to "give [her] a call" when his schedule permitted so

that she could help arrange the assessment and services around Father's work

schedule. Tr. Vol. II, p. 42.

[6] At the conclusion of the March 3, 2016 hearing, Father was "authorized to

have supervised parenting time" with the Child. DCS Ex. 2. Father attended a

supervised visit with the Child and Mother in April of 2016. During this visit,

there was no reaction from the Child when Father entered the room, no

interaction between Father and the Child, and "it didn't appear that [the Child]

even knew who he was." Tr. Vol. II, p. 25. In addition, Father was "on his

phone most of the visit." Tr. Vol. II, p. 25.

[7] Also in April of 2016, Patricia Doberneck, the Court-Appointed Special

Advocate ("CASA") assigned to the case, went to the family's home for a

previously-scheduled home visit. However, upon arriving at the home, Father

came out of the house and "would not let [Doberneck] in." Tr. Vol. II, p. 12. Father's actions gave Doberneck the impression that "they were hiding something." Tr. Vol. II, p. 14.

[8] Father attended a second supervised visit with the Child in August of 2016. Father did not attend any other supervised visits with the Child. Other than the April and August visits, Father has had no contact with the Child since she was removed from Mother's care in November of 2015.

[9] With respect to Father, the Child was adjudicated to be a CHINS on August 15, 2016. On September 8, 2016, the juvenile court entered a dispositional order in which it ordered Father to complete a parenting assessment and to follow all recommendations. Father, however, never completed the court-ordered parenting assessment. FCM Lockridge unsuccessfully attempted to contact Father "a couple times." Tr. Vol. II, p. 42. She was left with the understanding that Father would let her know when he would be able to complete the assessment and any necessary services. Despite being given her contact information in March of 2016, Father did not contact FCM Lockridge until June of 2017.

[10] Father appeared before the juvenile court for a hearing on December 8, 2016. During this hearing, Father indicated that he would take the steps necessary to become more involved in the Child's life. Father, however, did not do so.

[11] On April 5, 2017, DCS filed a petition seeking the termination of Father's parental rights to the Child. The juvenile court conducted an evidentiary

hearing on DCS's petition on December 11, 2017. During the evidentiary hearing, DCS presented evidence demonstrating that Father had (1) failed to complete the court-ordered parenting assessment and (2) indicated that he could not participate in services due to his work schedule. Doberneck testified that she had "seen very little motivation on [Father's] part as far as wanting to be involved with [the Child]" and that she was "just not sure that there's been much interest on [Father's] part in spending time with [the Child]." Tr. Vol. II, pp. 12–13. DCS also presented evidence that (1) Mother continued to struggle with substance abuse and was not in a position to care for the Child, (2) the Child was thriving in her current placement, and (3) its plan was for the Child to be adopted by her current foster parents. On January 18, 2018, the juvenile court issued an order terminating Father's parental rights to the Child.

# Discussion and Decision

[12] "The involuntary termination of parental rights is an extreme measure that is designed to be used only as a last resort when all other reasonable efforts have failed." *A.P. v. Porter Cty. Office of Family & Children*, 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000) (internal citation omitted).

> Choices about marriage, family life, and the upbringing of children are among associational rights the United States Supreme Court has ranked as of basic importance in our society and are rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect. A case involving the State's authority to permanently sever a parent-child bond demands the close consideration the Supreme

> Court has long required when a family association so undeniably important is at stake.

*Id*. (internal citations omitted).

# I. Procedural Due Process

The nature of the process due in parental rights termination proceedings turns on a balancing of the 'three distinct factors' specified in [*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)]: the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure.

*Id*. (internal citation omitted). "Finally, we must keep in mind the general proposition that if the State imparts a due process right, then it must give that right." *Id*. (internal citation omitted).

Father contends that the juvenile court's termination order should be reversed because DCS violated his due process rights by failing to offer him services.

> The Indiana Supreme Court has long recognized that, in seeking termination of parental rights, the DCS has no obligation to plead and prove that services have been offered to the parent to assist in fulfilling parental obligations. Likewise, we have stated on several occasions that, although the DCS is generally required to make reasonable efforts to preserve and reunify families *during the CHINS proceedings*, that requirement under our CHINS statutes is not a requisite element of our parental rights termination statute, and a failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law.

*In re J.W., Jr.*, 27 N.E.3d 1185, 1190 (Ind. Ct. App. 2015) (internal quotations and citations omitted, emphasis in original). Like the parties in *In re J.W., Jr.*, Father's argument on appeal effectively amounts to "a request to make the providing of services by the DCS a basis on which to directly attack the termination order." *See id.* As we concluded in that case, such a request "is contrary to our case law, and reads into our termination statutes a provision that our legislature has not [seen] fit to include." *Id.* (rejecting the Appellants' argument that the termination order should be set aside because DCS allegedly failed to provide services during the underlying CHINS proceedings).

[15] Review of the record clearly demonstrates that DCS was prepared to offer Father any services that were deemed necessary, but that Father rejected the services because of his work schedule. We have previously concluded that "a parent may not sit idly by without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting." *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000); *see also Jackson v. Madison Cty. Dept. of Family and Children*, 690 N.E.2d 792, 793 (Ind. Ct. App. 1998).

[16] In this case, Father did not merely "sit idly by" but rather expressly declined the opportunity to complete a parenting assessment or participate in services. As is outlined above, on March 3, 2016, Father informed FCM Lockridge that "he was always on the road and wouldn't be able to complete services." Tr. Vol. II, p. 25. Although being authorized to have supervised parenting time, Father only visited the Child twice between March of 2016 and August of 2016. Other

than these two visits, Father has had no contact with the Child since November of 2015. Father also failed to complete the court-ordered parenting assessment, completion of which was important to determine what services, if any, were necessary before the Child could be returned to Father's care. Further, although FCM Lockridge reached out to Father and offered to arrange the assessment and services around his work schedule, Father did not take advantage of FCM Lockridge's offer.

[17] It was "within the [juvenile] court's purview to credit or not credit" Father's claim that DCS refused to offer him the services necessary for reunification with the Child. *See In re J.W., Jr.*, 27 N.E.3d at 1191. Given the facts and circumstances of this case, we will not disturb the juvenile court's decision in this regard.

[18] The judgment of the juvenile court is affirmed.

Baker, J., and Kirsch, J., concur.