## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 08 2017, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT,
T.B.

John T. Wilson
Anderson, Indiana

ATTORNEY FOR APPELLANT,
J.L.

William Byer, Jr.
Byer & Byer
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re: Termination of the Parent-Child Relationship of:
L.B. (Minor Child),

　　　　and,

T.B., (Mother) and J.L. (Father),

*Appellants-Respondents,*

　　　　v.

December 8, 2017

Court of Appeals Case No.
48A05-1703-JT-719

Appeal from the Madison Circuit Court

The Honorable G. George Pancol, Judge

Trial Court Cause No.
48C02-1606-JT-46

Indiana Department of Child
Services,

*Appellee-Petitioner.*

**Barnes, Judge.**

# Case Summary

T.B. ("Mother") and J.L. ("Father") appeal the termination of their parental

rights to their daughter, L.B.  We affirm.

# Issue

The combined restated issue is whether there is sufficient evidence to support

the termination of Mother's and Father's parental rights.

# Facts

L.B. was born in July 2014.  At the hospital, L.B.'s meconium tested positive

for marijuana.  On August 25, 2014, the Madison County Office of the

Department of Child Services ("DCS") filed a petition alleging L.B. was a child

in need of services ("CHINS").  L.B. was left in Mother's care at that time;

Father had not yet established his paternity.  On September 2, 2014, DCS filed

an amended CHINS petition after Mother allegedly tested positive for

methamphetamine.[1]  L.B. was removed from Mother's care at this time.  Father declined to take custody of L.B., and DCS placed her with her maternal grandmother ("Grandmother").  On October 22, 2014, L.B. was found to be a CHINS after Mother admitted that L.B. was born with marijuana in her system.  At this time, Father refused to undergo paternity testing and did not believe he was L.B.'s father.

[4]     L.B. has severe special needs.  She has a genetic condition called Bardet-Biedl Syndrome.  Because of this condition, L.B. has frequent breathing difficulties, which causes her to be hospitalized three to four days every month.  She must be fed through a gastric tube.  She has developmental delays, as well as an extra finger on one hand and one extra toe on each foot.  In the future, L.B. may develop kidney, heart, and liver problems.  At one point, L.B. was scheduled to have surgery to remove her extra digits but became too ill for the surgery to occur.  Grandmother has undergone training to care for L.B., who visits six different medical specialists and has therapy appointments five days a week.  A home health nurse also assists with L.B.'s care.  Neither Mother nor Father have ever had training on how to care for L.B.

[5]     The original CHINS dispositional order for Mother required her, among other things, to participate in supervised visitation, complete a substance abuse assessment and any recommended treatment, submit to random drug screens,

_____

[1] Mother and Father dispute the accuracy of this test result, and, in fact, sued the hospital that administered it for medical malpractice.

and obey the law. DCS referred Mother to a substance abuse program in early 2015. Mother completed the assessment but did not complete any of the resulting recommendations, and the referral was closed out in June 2015. Between June 2015 and August 3, 2016, Mother was drug tested at least seventy-one times; on at least fifty-one occasions she tested positive for methamphetamine and positive for THC on seven occasions. Mother was pregnant with another child during some of this period. This child was born in December 2015.

[6] Mother's drug use caused her legal difficulties. On February 29, 2016, she was charged with Level 6 felony possession of methamphetamine, Level 6 felony maintaining a common nuisance, Level 6 felony possession of a syringe, and Class C misdemeanor possession of paraphernalia. Mother remained in jail and was not permitted to bond out until she underwent a substance abuse evaluation. On June 27, 2016, Mother bonded out of jail and began undergoing substance abuse treatment. On August 1, 2016, Mother pled guilty as charged. She received an aggregate sentence of two years, all suspended to probation. Two days after pleading guilty, Mother tested positive for methamphetamine. At some point, Mother was arrested and jailed again while awaiting resolution of a probation violation notice. Eventually, the criminal court ordered Mother to participate in an inpatient treatment program rather than revoking her probation. On November 4, 2016, the court ordered Mother transported from jail to the treatment program, and on December 12, 2016, Mother was released from the program and went into a halfway house. Mother obtained

employment after going into the halfway house and paid rent. Children are not allowed to live there. In all, Mother was incarcerated for approximately 200 days in 2016.

[7] Mother had supervised visitation with L.B. from the outset of the CHINS case until early 2015, when it was terminated because of Mother's cancellations. Visitation was resumed shortly thereafter and continued until March 2016, when it was terminated again because of Mother's arrest and incarceration. Mother again had supervised visitation in July and August 2016 after she was released from jail, but it again was terminated when she was reincarcerated and it was not resumed. However, Mother claimed to have seen L.B. once, a couple of weeks before Christmas 2016, but then was informed by Grandmother that she was not allowed to have contact with L.B.

[8] As for Father, he finally agreed to undergo DNA paternity testing in early 2015 after having to be convinced to do so, and it was confirmed that he is L.B.'s father. DCS made six referrals for Father to have visitation with L.B., but he never consistently saw her, even when she was hospitalized and Father was allowed to have unsupervised visitation. Father underwent a court-ordered mental evaluation on April 16, 2015, which recommended that he undergo further psychological evaluation and comply with any DCS recommendations. The "Diagnostic Impressions" from the evaluation were, "Rule Out Personality Disorders [and] Intermittent Explosive Disorder [and] Substance Use Disorders." Ex. A. The CHINS dispositional order following this evaluation

did not explicitly require Father to undergo further psychological evaluation, but it did require him to participate in individual counseling.

[9] On September 12, 2015, Father went to Grandmother's house, walked in without permission, and threatened to take L.B. Grandmother insisted that Father leave but he refused to do so, saying that Mother was lying in the backyard dead with his unborn child and that "they" were trying to kill him. Tr. p. 140. Grandmother called the police to have Father removed, and he had an altercation with officers when they arrived. As a result of this incident, Father was charged with Level 6 felony battery against a police officer, Level 6 felony residential entry, Class A misdemeanor resisting law enforcement, and Class B misdemeanor disorderly conduct. After the charges were filed, the criminal court entered a no-contact order for Grandmother's and L.B.'s protection, and Grandmother also obtained a civil protective order against Father. The no-contact and protective orders precluded Father having visitation with L.B., although he apparently did see her in December 2015 in violation of those orders.

[10] Father repeatedly refused to comply with or participate in services referred to him by DCS. He did not complete a requested domestic violence assessment. He was required to submit to random drug screens as part of the CHINS dispositional order; however, after submitting to three screens in December 2015, all of which were negative, Father refused to submit to any more. DCS repeatedly referred Father to a Fatherhood Engagement program. Father finally completed an assessment for that program in February 2016. Thereafter,

Father failed to comply with recommended services for the program, and at one point threatened to sue the program counselor.

[11]    On March 2, 2016, Father was charged with Level 4 felony dealing in methamphetamine, Level 6 felony maintaining a common nuisance, Level 5 felony possession of a syringe, and Class C misdemeanor possession of paraphernalia. The record indicates that these charges were related to Mother's similar charges at the same time.[2] Father's bond for these charges was revoked on March 28, 2016. About two months later, the criminal court held a hearing on Father's request to be put in work release pending trial. During the hearing, Father testified that he had recently accused a DCS attorney of using cocaine and personally administered a drug test to the attorney. After this testimony, the prosecutor requested that Father undergo a psychological examination, and defense counsel asked the court not to rule on his work release request until the exam was complete. The DCS attorney then testified that, in a recent CHINS hearing, Father had accused her in February 2016 of using cocaine, of having a white powder under her nose, and of testing positive for cocaine. However, the attorney testified that Father, in fact, had been banned from coming to the DCS office since late fall 2015 and that the drug test never occurred.

[12]    After the requested psychological examination was performed, Father was found competent to stand trial. On October 16, 2016, Father pled guilty to

---

[2] Mother is listed as Father's co-defendant on the CCS.

Level 6 felony residential entry with respect to the September 12, 2005 incident involving Grandmother, Level 6 felony possession of a legend drug and Level 6 felony maintaining a common nuisance with respect to the March 2, 2016 charges, and Class B misdemeanor practice of law by a nonattorney in a separate case. The plea agreement provided for a sentencing cap of five years, with sentencing to be stayed pending Father's successful completion of the Madison County Veteran's Court program. However, on December 9, 2016, that program filed a notice with the court opining "that defendant is beyond Veteran's Court ability to treat i.e. Explosive Personality Disorder; Manipulative Practices; Intimidation; and eradicate [sic] and violent responses to life in general. Request for participation is therefore DENIED." Ex. 8(a) at 18. Father then sought to be evaluated by the Marion County Veteran's Court program instead. This request was still pending at the end of January 2017.

[13] On June 9, 2016, DCS filed a petition to terminate Mother's and Father's parental rights to L.B. The trial court held hearings on the petition on December 6, 2016, and January 27, 2017. At the January hearing, Mother's substance abuse counselor testified as to the progress she was making in her treatment, but recognized the possibility that she could relapse. Grandmother also acknowledged Mother's recent progress but also said she did not trust Mother because of her history of going "back and forth" in the past. Tr. p. 146. On March 2, 2017, the trial court entered an order terminating Mother's and Father's parental rights, accompanied by extensive findings. Mother and Father now appeal.

# Analysis

[14] Mother and Father contend there is insufficient evidence to support the termination of their parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children,* 796 N.E.2d 280, 285 (Ind. 2003)). We recognize that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.'" *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*). Courts need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 372 (Ind. Ct. App. 2006), *trans. denied*. "Rather, when the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate." *Id.*

[15] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re I.A.*, 934 N.E.2d at 1132. We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Father and Mother's parental rights, as required by Indiana Code Section 31-35-2-8(c). *See In re N.G.*, 61 N.E.3d 1263, 1265 (Ind. Ct. App. 2016). When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *In re I.A.*, 934 N.E.2d at 1132. We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[16] Indiana Code Section 31-35-2-8(a) provides that, "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

[17] Here, the trial court found that continuation of the parent-child relationship posed a threat to L.B. Mother and Father both challenge that finding.[3] When considering whether there is sufficient evidence to support such a finding, trial courts must "consider a parent's habitual pattern of conduct to determine

---

[3] Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS needed to prove only one of the requirements of subsection (B). We conclude there is sufficient evidence that continuation of the parent-child relationship posed a threat to L.B.'s well-being and need not consider whether there is a reasonable probability that the conditions resulting in L.B.'s removal from Mother's care (and nonplacement with Father) would not be remedied.

whether there is a substantial probability of future neglect or deprivation." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 152 (Ind. 2005). "At the same time, however, a trial court should judge a parent's fitness to care for his child as of the time of the termination proceeding, taking into consideration evidence of changed conditions." *Id.*

[18]  The trial court extensively detailed in its findings Mother's history of severe drug use and related criminal problems, which resulted in Mother having very limited contact with L.B. for most of the entire year preceding the termination hearings and being unable (or unwilling) to participate in visitation and DCS reunification services. Mother contends the trial court improperly overlooked evidence of and should have entered findings regarding changed conditions, namely her completion of an inpatient treatment program and placement in a halfway house shortly before the termination hearing(s), and the testimony of her substance abuse counselor that she appeared to be making progress. The trial court did in fact address this evidence in its findings:

> 24.) Mother has not completed any court ordered services, reunification services or otherwise demonstrated during pendency of the underlying CHINS case and life of the Child that she has put forth any earnest and sincere effort to acknowledge and overcome her substance abuse addiction or otherwise eliminated substance abuse and addiction or criminal activity as her lifestyle notwithstanding her very recent and limited successful completion of an inpatient program at Life Springs and participation in court ordered treatment at Stepping Stones.

25.)   Mother's ongoing substance abuse and her constant re-incarceration for violation(s) of probation due to noncompliance with treatment services and continued positive drug screens as outlined in paragraph 22 establishes a pattern of conduct by Mother that makes her recent and brief participation in Stepping Stones Halfway House meaningless to the Court as evidence of a successful recovery sufficient for Mother to regain any ability to parent this Child or remedy the conditions that led to the Child's removal and continued placement in that her recent compliance and sentence to Stepping Stones is court ordered as a consequence and sentence for her probation violations, and Mother is facing even more incarceration if she violates her probation again.

Appellant Mother's App. Vol. II p. 30.  We cannot say these findings are clearly erroneous.  They represent the trial court's weighing of the entirety of the evidence, going back nearly two-and-a-half years, and the judging of witness credibility, which we cannot second guess.

[19]   As for Father, he displayed little interest in doing anything to reunify with L.B. during the entirety of the CHINS proceedings, repeatedly refusing to cooperate in any way with DCS or its service providers, including refusing to undergo regular drug testing.  Father's erratic behavior led to the incident at Grandmother's house that caused him to be prohibited from having contact with L.B. and also to curtailing his ability to communicate with the DCS local office.  Father seems to suggest that, after his April 2015 mental evaluation, the trial court and/or DCS should have offered or required him to participate in further psychological evaluation and mental health treatment.  However, "the responsibility to make positive changes will stay where it must, on the parent.

If the parent feels the services ordered by the court are inadequate to facilitate the changes required for reunification, then the onus is on the parent to request additional assistance from the court or DCS." *Prince v. Dep't of Child Servs.*, 861 N.E.2d 1223, 1231 (Ind. Ct. App. 2007).

[20] Of course, a large part of Father's inability to meaningfully participate in L.B.'s life was a result of the no-contact and protective orders obtained against him after the incident at Grandmother's house on September 12, 2015. Father contends these orders should not have existed throughout the remainder of the CHINS case, citing *A.P. v. Porter County Office of Family & Children*, 734 N.E.2d 1107 (Ind. Ct. App. 2000), *trans. denied*. That case addressed DCS's predecessor's failure to follow clear procedural and statutory requirements in obtaining a no-contact order against the father as part of the CHINS proceedings. *See id.* at 1116-17. Here, the no-contact and protective orders were issued in separate criminal and civil proceedings against Father because of his illegal and threatening conduct, and there is no indication that these orders were obtained and maintained improperly or in violation of any statute.

[21] Father also asserts that DCS somehow denied him due process of law because it was biased against him, as revealed by the DCS attorney's testimony at his work release hearing regarding his false, possibly delusional accusations that she was using cocaine and that he had personally drug tested her. It is unclear what Father's precise argument is, but it appears to be that the attorney's testimony resulted in him being incarcerated while awaiting trial, thus further restricting him from participating in services to reunify with L.B. However,

Father's request at that particular hearing to participate in work release had already been denied, and the trial court had ordered Father to undergo a psychological examination before the attorney testified.

[22] Finally, Father's legal status was unsettled at the time of the termination hearing. He had pled guilty to three different incidents of criminal conduct during the CHINS proceedings, including the incident at Grandmother's house and the drug case in which Mother also was involved. Although Father's plea agreement provided the opportunity for a completely-suspended sentence, it was contingent upon his successful completion of the Madison County Veteran's Court program. He was not accepted into that program because of his erratic behavior, which had been occurring throughout the CHINS case. Although Father was attempting to gain entrance into the Marion County Veteran's Court program at the time of the termination hearing, that issue had not been resolved yet. In any case, Father's continued legal difficulties certainly are relevant to his habitual pattern of conduct throughout the CHINS proceedings.[4]

[23] We now consider whether the above evidence regarding Mother and Father established that continuation of the parent-child relationship posed a threat to L.B.'s well-being. In analyzing this issue, it is crucial to note the special needs

---

[4] Mother and Father also reiterate arguments made during the CHINS proceedings that the original drug testing of Mother around the time of L.B.'s birth was flawed and should not have formed the basis of the original CHINS finding. However, that finding was made after Mother admitted that L.B. was born with marijuana in her system and was not reliant upon the disputed drug test results.

of this child. She requires extensive therapy, highly-specialized care, and frequent hospitalizations. Grandmother has undergone specialized training to learn how to care for L.B. and additionally requires the assistance of a home health nurse. Meanwhile, for almost two-and-a-half years, while L.B. was receiving extensive medical treatment and Grandmother was caring for her, Mother and Father continued using drugs heavily, and engaging in illegal or erratic behavior, and making little to no progress in stabilizing their own lives. They also never learned how to care for L.B. Under such circumstances, it would be extremely difficult for either parent to adequately care for a child with no health problems, let alone one with L.B.'s special needs. It is not difficult to see how allowing continuation of the parent-child relationship could very directly threaten harm to L.B. The trial court's findings on this point were not clearly erroneous.

[24] Mother and Father also contend that termination is not in L.B.'s best interests. When considering whether there is sufficient evidence that termination of parental rights is in a child's best interests, we consider the totality of the evidence and look beyond the factors identified by DCS. *In re J.C.*, 994 N.E.2d 278, 289-90 (Ind. Ct. App. 2013). The interests of the parents must be subordinated to the needs of the child. *Id.* at 290. Recommendations of DCS caseworkers and court-appointed special advocates, combined with evidence that continuation of the parent-child relationship poses a threat to the child, are sufficient to prove by clear and convincing evidence that termination is in a child's best interests. *Id.* Children have a paramount need for permanency,

which is a central consideration in evaluating a child's best interests. *In re E.M.*, 4 N.E.3d 636, 647-48 (Ind. 2014).

[25] Both the DCS case manager and L.B.'s court-appointed special advocate unequivocally testified that termination was in her best interests. They noted the excellent, loving care that L.B. was receiving from Grandmother, who wished to adopt L.B. with DCS's blessing. The DCS case manager specifically rejected the possibility of a guardianship for L.B., noting that it would not give L.B. the permanency she needed. Given the minimal, if any, progress the parents had made during the entirety of the CHINS case, it is unclear how long L.B. would have to wait for them to improve, if they ever did. In sum, there is sufficient evidence to support the trial court's finding that termination of Mother's and Father's parental rights was in L.B.'s best interests.

## Conclusion

[26] There is sufficient evidence to sustain the termination of Mother's and Father's parental rights to L.B. We affirm.

[27] Affirmed.

May, J., and Bradford, J., concur.