## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 03 2019, 8:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven J. Halbert
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of:

A.B. (Minor Child)

and

A.S. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

January 3, 2019

Court of Appeals Case No.
18A-JT-1786

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Larry E. Bradley, Magistrate

Trial Court Cause No.
49D09-1711-JT-1019

**Bailey, Judge.**

# Case Summary

A.S. ("Father") appeals the termination of his parental rights as to A.B. ("Child").[1] We affirm.

# Issues

Father presents the following restated issues:

    I.      Whether Father was deprived of due process because he had no meaningful opportunity to contest allegations that Child was a Child in Need of Services ("CHINS"), despite having waived the right to a CHINS fact-finding hearing.

    II.    Whether the evidence is sufficient to support termination of Father's parental rights.

# Facts and Procedural History

Child was born in May 2013 to D.B. ("Mother"). At some point, Mother told the Marion County Department of Child Services ("DCS") that D.F. was Child's father. In June 2015, when Mother was incarcerated, DCS filed a petition alleging Child was a CHINS. Child was placed in foster care.

---

[1] Child's mother consented to adoption, and does not actively participate in this appeal.

[4]     After Mother admitted Child was a CHINS and D.F. waived a hearing, the juvenile court adjudicated Child a CHINS in October 2015. The next month, the court entered a dispositional decree and ordered D.F. to submit to DNA testing. At some point, Father contacted DCS about the possibility of being Child's biological father. Both Father and D.F. submitted to DNA testing, which indicated that Father was Child's biological father. In early 2016, (1) the juvenile court dismissed D.F. from the matter, (2) DCS amended its petition to include Father, and (3) the court conducted an initial CHINS hearing as to Father. Without vacating its prior CHINS adjudication, the juvenile court scheduled—as to Father only—a fact-finding hearing on the amended CHINS allegations. In July 2016, Father waived his right to a fact-finding hearing, and requested that Child be placed in kinship care with C.C. ("Crosley").

[5]     In August 2016, the juvenile court entered an order adjudicating Child a CHINS and authorizing placement with Crosley. The court later entered a dispositional decree as to Father only, with a permanency plan of reunification. The court also ordered Father to submit to drug and alcohol screens, complete a father-engagement program, and engage in home-based therapy, following all recommendations. At that time, Child remained in kinship care with Crosley.

[6]     In November 2017, DCS filed a petition to terminate parental rights. The juvenile court held a hearing on the petition in July 2018, and later entered an order terminating Father's parental rights. Father now appeals.

# Discussion and Decision

## Due Process

"Due process requires 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *In re K.D.*, 962 N.E.2d 1249, 1257 (Ind. 2012) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). The process due in CHINS matters as well as actions to terminate parental rights "turns on balancing three *Mathews* factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure." *Id.* Whether a party has been deprived of due process is a question of law that we review *de novo*. *See Morton v. Ivacic*, 898 N.E.2d 1196, 1199 (Ind. 2008).

In this case, Father claims he was deprived of due process because, at the time the juvenile court offered a fact-finding hearing on the CHINS allegations, the court had already adjudicated Child a CHINS.[2] Father points out that the court never vacated its initial adjudication, and he argues that a "second CHINS hearing was a meaningless sham with no legal significance whatsoever." Br. of Appellant at 11-12. According to Father, "[a]lthough his counsel should have

---

[2] Although Father is appealing from the order terminating parental rights—long after the separate CHINS adjudication—Indiana appellate courts have at times addressed procedural issues in the underlying CHINS proceedings when considering the propriety of a subsequent termination order. *See, e.g.*, *A.P. v. Porter Cty. Office of Family & Children*, 734 N.E.2d 1107, 1118 (Ind. Ct. App. 2000) ("[W]hen, as here, a record is replete with procedural irregularities throughout CHINS and termination proceedings that are plain, numerous, and substantial, we are compelled to reverse a termination judgment on procedural due process grounds."). We assume without deciding that Father's challenge is timely, and thus proceed to the merits of his argument.

objected to the fundamental violation of [his] rights, this violation requires reversal even though there was no objection made at trial." *Id.*

In arguing that he was entitled to a fact-finding hearing without the shadow of an existing CHINS adjudication, Father directs us to several cases. Yet, unlike the parents in those cases, Father did not contest the CHINS allegations and instead chose to waive his right to a fact-finding hearing. *Cf., e.g.*, *In re K.D.*, 962 N.E.2d at 1258-59 (identifying a violation of due process where the court did not hold the requested fact-finding hearing and instead held a contested dispositional hearing); *In re L.C.*, 23 N.E.3d 37, 42 (Ind. Ct. App. 2015) (identifying a violation under facts similar to those in *In re K.D.*), *trans. denied*; *In re S.A.*, 15 N.E.3d 602, 609 (Ind. Ct. App. 2014) (identifying a violation where the court held a fact-finding hearing but "had already determined" the child was a CHINS in light of the other parent's admission), *aff'd on reh'g*, *trans. denied*.

At bottom, Father is arguing that the fact-finding hearing—had it been held— would have been constitutionally deficient. Yet, because Father waived his right to the hearing, we are unpersuaded that he was deprived of due process.

## Sufficiency of the Evidence

"A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Our General Assembly has thus set a high bar for terminating parental rights." *In re Bi.B.*, 69 N.E.3d 464, 465 (Ind. 2017).

Under Indiana Code Section 31-35-2-4(b)(2), a petition seeking to terminate the parent-child relationship must allege, in pertinent part:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree. . . .
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child. . . .
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

The petitioner must prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2. If the court determines the allegations are true, "the court shall terminate the parent-child relationship." I.C. § 31-35-2-8(a). In doing so, the court must enter findings and conclusions, irrespective of whether the parties have requested them. *See* I.C. § 31-35-2-8(c); Ind. Trial Rule 52. We will not "set aside the findings or judgment unless clearly erroneous," T.R.

52(A); clear error is "that which leaves us with a definite and firm conviction that a mistake has been made," *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). In reviewing for clear error, we look to "whether the evidence supports the findings, and whether the findings support the judgment." *Steele-Giri v. Steele*, 51 N.E.3d 119, 123 (Ind. 2016). Moreover, we neither reweigh the evidence nor judge the credibility of witnesses, *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016), and we give "due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses," T.R. 52(A).

[14]  Father does not dispute the sufficiency of the evidence under subsections (A), (C), and (D) of the termination statute. He instead focuses on subsection (B), directing argument toward the propriety of termination under (B)(i) (pertaining to changed conditions) and (B)(ii) (pertaining to the well-being of a child). As this portion of the statute is written in the disjunctive, we need only address subsection (B)(ii)—as to which the court made the following finding:

> There is a reasonable probability that the continuation of the parent-child relationship poses a threat to [Child's] well-being in that it would pose a barrier to obtaining permanency for her through an adoption into an appropriate home that she has known for two years, and obviously wishes to stay. [Child's] therapist believes that it would be devastating to [Child] to be moved. There was evidence of her behavior toward [Father] which would highly suggest there is an acute lack of bond between [Child] and [Father].

Appellant's App. Vol. 2 at 16.

[15]     At the hearing, there was evidence that Child suffers from Reactive Attachment Disorder arising from a lack of long-term bonding with a caregiver, and that Child needs stability, consistency, and "reassurance that . . . nobody is going to leave her." Tr. Vol. II at 55. Children with the disorder tend to have "difficulty with affect regulation, expressing feelings, [and] building trust with caregivers." *Id.* at 37. Father did not have a relationship with Child until he became a part of the CHINS proceedings in 2016, when Child was almost three years old. Father initially received supervised parenting time. His parenting time was suspended in December 2016 due to inconsistent participation. Because of Child's "behaviors based off of [Father's] inconsistencies" and "the severity of her behaviors at the time," the goal turned to reintroducing Father on "a therapeutic level starting with talking about him" and "showing her pictures." *Id.* at 60. When Child "had more coping skills in terms of being able to manage her anxiety enough to be able to engage in . . . phone calls," Child's therapist recommended therapeutic phone calls progressing toward video calls. *Id.* at 43.

[16]     Father participated in phone calls from June to September 2017 and then video calls from October to December 2017, but was inconsistent in his participation. During calls, Child's therapist observed Child "run out of the room, verbally protest calling," hide, and exhibit increased defiance. *Id.* at 38. At least once, Child sought "a lot of reassurance from Ms. Crosley after the phone calls that she wasn't going anywhere." Tr. Vol. II at 38. At some point, Father said he would consent to adoption if he could remain in Child's life. Providers then decided "it would be in the best interest of everybody involved to start visitation

time so that [Child] was comfortable with [Father] prior to an adoption happening and then Ms. Crosley not having support from a provider in initiating those meetings." *Id.* at 38-39. Father began supervised parenting time in January 2018, but participated in only six of ten opportunities. According to Child's therapist, Child seemed distressed by the parenting time, and Father's "inconsistency . . . plays into the distress that it's causing her." *Id.* at 41.

[17] There was evidence that Child had been living with Crosley since August 2016. Child's therapist opined that if Child were to leave Crosley's care "it would be very detrimental to her overall well-being," in that Child "formed a bond with Ms. Crosley and that's been who she considered her mother for the past several years." *Id.* at 42. At the hearing, Father agreed that it was important to be there for Child when he said he was going to be there, and that it was also detrimental to Child when he was not there when she expected him to be there.

[18] In arguing that the evidence is insufficient to support termination, Father contends that a lack of bonding and a need for permanency should not be enough. Father asserts that any child who has been removed for the statutory period "will likely have formed a bond with [a] foster or pre-adoptive caregiver," making continuation of the parent-child relationship "a barrier to 'permanently' resolving the situation" in all cases. Br. of Appellant at 17. Father also directs our attention to his struggles with homelessness and poverty. He contends that, under his circumstances, "DCS made it impossible for [him] to comply with all its requirements," *id.* at 21, and that "DCS deliberately placed barriers" that made it difficult for him to establish a bond. *Id.* at 18.

[19] Nevertheless, we cannot reweigh evidence, which indicates that Father's inconsistent participation was partly his choice, with testimony that "one minute he wanted to" participate in parenting time and "one minute he didn't," and "if he has a bad day . . . he doesn't want to talk, he doesn't want to see her." Tr. Vol. II at 14. Indeed, the court found that Father "voices interest in having his daughter placed with him," but "has not demonstrated he is willing to be a full-time Father." Appellant's App. Vol. 2 at 15. Ultimately, in light of Child's diagnosis of Reactive Attachment Disorder and Father's inconsistent participation in parenting time over the course of two years, we cannot say that the juvenile court clearly erred in identifying a reasonable probability that continuation of the relationship posed a threat to the well-being of Child.

# Conclusion

[20] Father was not deprived of due process, and there is sufficient evidence supporting the juvenile court's decision to terminate Father's parental rights.

[21] Affirmed.

Bradford, J., and Brown, J., concur.