## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 03 2019, 8:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of: Ri.W. and Rv.W. (Minor Children),

and

J.W. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 3, 2019

Court of Appeals Case No.
19A-JT-1403

Appeal from the Greene Circuit Court

The Honorable Erik C. Allen, Judge

Trial Court Cause No.
28C01-1902-JT-4
28C01-1902-JT-5

**Tavitas, Judge.**

## Case Summary

J.W. ("Father") appeals the termination of his parental rights to Rv.W. and Ri.W. (collectively, the "Children").[1] We affirm.

## Issues

Father raises two issues for appeal, which we restate as:

I.  Whether the Department of Child Services' ("DCS") actions during the pendency of the action violated Father's due process rights.

II. Whether there was sufficient evidence to terminate Father's parental rights.

## Facts

The twin Children were born in August 2017, at which time Father was incarcerated. Father was released a week later, and B.A. ("Mother") did not allow Father to see the Children. On October 12, 2017, DCS filed petitions alleging the Children were children in need of services ("CHINS"). The petitions alleged that Ri.W. presented at the hospital with a broken arm and symptoms of neurological damage, and Mother and her boyfriend's

---

[1] Both Father and DCS use these abbreviations for the Childrens' names in their briefs; therefore, we will do the same. The court reporter identifies both of the Children as "R," and we will attempt to distinguish between the Children in the transcript when possible.

explanations for the injuries were inconsistent. The petitions alleged that the injuries were not the result of an accident, and DCS requested the Children's removal on an emergency basis. That same day, the trial court granted the removal of the Children.

[4] The trial court found the Children to be CHINS on December 21, 2017,[2] after a fact finding hearing, and entered a dispositional decree on February 21, 2018. The dispositional decree required Mother, Father, and Mother's boyfriend to: (1) notify the case manager of any arrest or criminal charges; (2) allow the case manager access to visit their homes; (3) enroll in all services recommended by the case manager; (4) keep all appointments for services; (5) find and maintain suitable housing; (6) secure and maintain a legal source of income; (7) participate in a protection plan for Children; (8) prohibit the use of drugs and alcohol; (9) complete a parenting assessment; (10) participate in a substance abuse statement; (11) participate in random drug screens; (12) participate in a psychological evaluation; (13) follow the recommendations by doctors for the Children's medical needs; and (14) participate in supervised visits with the Children.

[5] After the Children's removal, Rv.W. demonstrated certain developmental delays and impairments that Father struggled to address. Specifically, Rv.W.

---

[2] The trial court's termination order states that, although a CHINS finding was entered in December 2017, an order on fact finding hearing on the CHINS petition was not entered until March 8, 2018. No reason is provided for the delay.

suffers from significant development issues in virtually every area, including visual impairment, inability to communicate with words, and delayed processing of information. Due to Rv.W.'s age and development, ongoing services and therapy are imperative. Rv.W.'s doctors believe that her neurological issues may stem from Shaken Baby Syndrome.

[6] Despite the Children's foster mother ("Foster Mother") providing Father with lists of doctor's appointments, Father attended only three of the Children's many doctors' appointments in eighteen months. Moreover, while Father is aware Rv.W. has special needs, Father does not know exactly what Rv.W.'s special needs are and only became aware of Rv.W.'s issues after DCS notified Father.

[7] While the Children were CHINS, Father participated in services; however, Father's progress during services was minimal. Jared Sanders, with Legacy and Associates, worked with Father beginning in September 2018 to obtain a driver's license, improve budgeting skills, and to learn parenting skills. Father made little to no progress and Father cancelled many of his meetings with Sanders.

[8] Father also struggled with flexibility, problem solving, and adapting to meet the Children's needs. Father did not "take advice from other people" well regarding the Children's needs. Tr. Vol. II pp. 80-81. Father also struggled with the Children if they were not completing activities, such as eating the way Father wanted the Children to eat. Instead of adapting, Father took the food

away from the Children. Even when Foster Mother wrote instructions on how to care for the Children, Father struggled to follow those instructions. Father also appeared for supervised visits without food for the Children, despite his knowledge that he was required to bring food to the visits.

[9] Father also clashed with Paula Buskirk, who supervised Father's visits with the Children beginning November 2017. While Father initially was consistent with supervised visits, Father's visits became inconsistent, which resulted in a diminished bond with the Children. During these visits, Buskirk noted Father would "observe instead of engag[e]" with the Children. *Id.* at 121.

[10] Father twice reported Buskirk to her supervisor—claiming Buskirk left the children unattended in a car and drank alcohol while at work. DCS investigated both instances and cleared Buskirk. During an argument, Buskirk told Father that the Children "[were not] Father's kids." *Id.* at 227. Buskirk self-reported the incident to her supervisor and apologized to Father for the statement. Subsequently, Father requested another visitation supervisor, and Debra Hoesman, one of Father's therapists and a licensed clinical social worker, also recommended that Father receive another visitation supervisor due to a "personality clash" between Father and Buskirk. Buskirk, however, remained on Father's case. *Id.* at 84. Due to the tense relationship, Buskirk only stepped in during Father's visits if there was a safety concern.

[11] Olivia Whitcome, Buskirk's supervisor, covered Father's supervised visits in Father's home with the Children for Buskirk on occasion between August 2018

and September 2018. Whitcome observed that Father's house was not suitable for two toddlers. Specifically, there were no child safety locks in the home; a bottle of bleach under the sink was only secured with a cord; there were no locks on any of the doors; and the trash was placed in a location that the Children would have been able to access. Portions of the home lacked adequate heat for some time until Father's landlord ultimately remedied the situation.

[12] Father has a history of mental illness and was on medication for psychiatric conditions as a teenager. Dr. Julia Gatledge, a psychologist who worked with Father in February and March 2018, performed several tests on Father to test for "mental illness, personality disorders, and a parenting stress assessment." *Id.* at 63. Dr. Gatledge's tests revealed that Father does not presently have a mental illness; however, Father tested in the sixth percentile on his intelligence quotient ("IQ") test and "[is] far below average on interest and motivation for treatment." *Id.* Father's tests also revealed Father's anti-social behavior, which manifests by "not conforming to the law, difficulty in relationships, a lot of conflict in relationships, [identity] problems and a little bit of grandiosity"; in addition, Father has "difficulty with memory and processing speed." *Id.* at 64, 66.

[13] Father was evaluated by Hoesman from September 2018 to May 2019 and Hoesman diagnosed Father with generalized anxiety disorder; moreover, Father "called off" many sessions. *Id.* at 79. Despite Father's inconsistency, Father eventually stopped drinking alcohol.

[14] Father's compliance with the case plan was hampered by the fact that Father's transportation access was unreliable. Father's main method of transportation was to rely on assistance from his mother and stepfather.

[15] On February 12, 2019, DCS filed a petition for termination of Mother's and Father's parental rights following their noncompliance with the case plan in the CHINS case. The trial court held a fact finding hearing on the termination petition in May 2019.[3]

[16] Evidence at the fact finding hearing demonstrated that Father's criminal history includes a guilty plea for contributing to the delinquency of a minor in 2012 and criminal mischief in 2015. Father obtained an order for protection to protect Father from his former girlfriend; Father, however, contended the incident regarding the order for protection was a misunderstanding. Father also tested positive for buprenorphine on two drug screens in the weeks immediately before the fact finding hearing.[4]

[17] At the fact finding hearing, Father testified that "some" of the services offered by DCS were helpful, including anger management classes and one of his parenting classes. *Id.* at 31. Father argued that he was offered the right services

---

[3] At the fact finding hearing, the trial court acknowledged that Mother submitted a written voluntary relinquishment of her parental rights, which the trial court took under advisement pending the outcome of the fact finding hearing with regard to Father.

[4] Father explained the positive tests occurred after he "kissed [his former girlfriend] . . . that is how [he] got it in [his] system. . . ." Tr. Vol. II p. 26. Father testified he has never used buprenorphine but his former girlfriend has a prescription. Dr. Donna Coy, a toxicologist and lab team leader at Forensic Fluids Laboratories, testified it would be "highly unlikely" for kissing to produce the positive tests. *Id.* at 56.

and no longer needs any additional services; however, when asked whether the service providers were trying to help Father, Father answered "[y]es and no." *Id.* at 32. Father claimed that DCS lied to Father; Father did not trust DCS; and DCS did not want to return the Children to Father. Father also testified that he preferred "doing stuff [his] own way . . . people raise their kids differently," and he was "somewhat" offended to be told how to handle the Children. *Id.* at 33.

[18] Father receives $750.00 from Social Security for a disability that Father was unable to identify. Father also receives eighty dollars a week in food stamps and Medicaid assistance. Father does not presently work; however, Father testified that, if the Children were to return to Father, he would find a job.

[19] At the fact finding hearing, when asked about the conflict between Father and Buskirk, Whitcome testified: "I think you could have probably put anybody in there and it would be the same issue[]." *Id.* at 121. Whitcome's observation was more that Father did not want suggestions or feedback on how to care for the Children and likely would have issues with any supervisor.

[20] Debra Nolting, the court appointed special advocate ("CASA"), testified that the foster family would like to adopt the Children and that termination of Father's parental rights would be in the best interests of the Children. Carrie Goodwin, the family case manager ("FCM"), also testified that termination of Father's parental rights was in the Children's best interests.

[21]     Carl McCarty, one of Father's former therapists at Hamilton Center, testified on Father's behalf. McCarty began working with Father in June 2018, but McCarty was unsure how he began working with Father. After only one session, DCS terminated Father's therapy with McCarty because, according to DCS, McCarty's office was not providing Father with the correct services.

[22]     Heather Tuell, another therapist at Hamilton Center, testified that she was one of Father's home-based caseworkers from January through September 2018 and that she worked with Father on anger management pursuant to DCS's referral. Tuell testified that she and Father never finished their work together and that DCS "discontinued the services due to feeling that [Father] was not getting the services he needed[.]" *Id.* at 151. Later, FCM Goodwin testified that Tuell was the one who notified DCS that Tuell's role was changing at Hamilton Center and, therefore, Father needed to be reassigned, which was why services were discontinued. Tuell also testified that, when she asked DCS for "clarification of what was to be provided or what was to be done during home-based casework [she] would never get a straight answer," and "trying to get clarification on what exactly was supposed to be done outside of anger management was difficult at best." *Id.* at 152.

[23]     In a written order on June 6, 2019, the trial court terminated Father's parental rights. Father now appeals.

Analysis

Father appeals the termination of his parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'" *In re K.T.K.,* 989 N.E.2d at 1230 (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

Pursuant to Indiana Code Section 31-35-2-8(c), "The trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" when granting a petition to terminate parental rights.[5] Here, the

---

[5] Indiana Code Sections 31-35-2-8(a) and (b), governing termination of a parent-child relationship involving a delinquent child or CHINS, provide as follows:

> (a) Except as provided in section 4.5(d) of this chapter, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.

trial court did enter findings of fact and conclusions of law in granting DCS's petition to terminate Father's parental rights. When reviewing findings of fact and conclusions of law entered in a case involving the termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[26]     Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (A)     That one (1) of the following is true:
>
> (i)     The child has been removed from the parent for at least six (6) months under a dispositional decree.

---

(b)  If the court does not find that the allegations in the petition are true, the court shall dismiss the petition.

> > (ii) The court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>
> > (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child.
>
> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and
> treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

## I.    Father's Due Process Rights

Father first argues his due process rights were violated during the termination proceeding.

> The nature of the process due in parental rights termination proceedings turns on a balancing of the 'three distinct factors' specified in *Matthews v. Eldridge,* 424 U.S. 319, 335 [ ] (1976): the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure.

*A.P. v. Porter Cty. Office of Family and Children,* 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000) (citations omitted), *trans denied.*

Father argues that his due process rights were violated because Father had "no real opportunity" to obtain benefits because, once he made progress with therapist Tuell, "her agency was taken off [Father's] case." Appellant's Br. p. 20. Father also argues that his issues with Buskirk warranted replacement of Buskirk on Father's case.[6] DCS counters that, because Father never raised any

---

[6] Father makes a reference in his brief to the fact that: "The children were removed in October 2017. [Father] received notice only after the girls' mother's initial hearing in the CHINS action. [Father] did not have his

due process arguments with the trial court, this argument is waived. We agree with DCS that Father never argued below that his due process rights were violated; accordingly, Father's argument is waived. *See In re N.G.,* 51 N.E.3d 1167, 1173 (Ind. 2016) ("[A] party on appeal may waive a constitutional claim, including a claimed violation of due process rights, by raising it for the first time on appeal."). Waiver notwithstanding, we will address Father's arguments.

[29] Our Court dealt with a similar argument in *Matter of C.M.S.T.,* 111 N.E.3d 207, 212-13 (Ind. Ct. App. 2018), in which the parents alleged that DCS violated their due process rights by discontinuing services, accelerating the visits and home placement schedule, and denying the escalation of visitation to the parents. Our Court found DCS's handling of the parents' case was "chaotic and unprofessional," which resulted in a due process violation. *Id.* Here, the record is devoid of any such evidence that would warrant a finding that Father's due process rights were violated.

[30] First, although Father may have made progress with Tuell, the record demonstrates that, even if DCS continued to use her agency, Tuell likely would not have continued therapy with Father due to her new role within the agency. Regardless, even if Father enjoyed his sessions with Tuell, DCS's decision to

---

initial hearing until October 25, 2017." Appellant's Br. p. 20. To the extent Father argues that this was a violation of his due process rights, this argument is waived for failure to make a cogent argument. *See* Ind. Appellate Rule 46(A)(8)(a).

change service providers, alone, does not warrant a finding that Father's due process rights were violated.

[31] Next, Father's issues with Buskirk and DCS's failure to replace Buskirk with a different visitation supervisor do not constitute a due process violation. Buskirk became frustrated with Father, yelled at him, and told Father the Children were not his. Buskirk self-reported her improper statement and apologized to Father. DCS investigated Father's claims against Buskirk and ultimately cleared Buskirk before putting her back on Father's case. Buskirk remained on Father's case because Buskirk thought she could help Father, and DCS agreed. Regardless, Buskirk's supervisor, who replaced Buskirk on more than one supervised visit, indicated that anyone would have had the same issues with Father.

[32] Father's due process rights were not violated by DCS's decision to change service providers or by DCS's failure to change Father's visitation supervisors.

## II. Sufficient Evidence

[33] Father also argues that the evidence was insufficient to prove that continuation of his parental relationship would pose a threat to the Children's well-being.[7] Father specifically argues the evidence did not support the trial court's

---

[7] Father also argues that DCS did not prove that the reasons that resulted in the Children's placement outside the home will not be remedied. As Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS needed only prove either that continuation of the parent-child relationship poses a threat *or* that the reasons that resulted in the Children's placement outside the home will not be remedied. We, therefore, only address the former.

conclusion that the continuation of Father's relationship would be a threat to the Children's well-being because: (1) Father "was unable to engage in services purposefully" due to DCS's actions; (2) Father has quit drinking; and (3) Father's mental issues occurred while he was younger, and people with issues like Father "live independently and raise children." Appellant's Br. pp. 27-28.[8]

[34] First, we disagree with Father's conclusion that he was unable to engage in services purposefully. Even with issues discussed in Section I, supra, Father's other service providers indicated that Father made minimal progress. Moreover, the evidence demonstrates that Father's parenting skills never improved as Father did not progress past supervised visits; case managers did not believe Father was suited to manage Rv.W.'s special needs; and Father was unlikely and/or unwilling to follow suggestions from service providers with regards to the Children's needs.

[35] While it seems Father has made progress with regard to drug and alcohol use over the years, Father failed two drug screens shortly before the fact finding hearing. Father did not follow through on many case plan objectives, cancelled many services, and attended very few of the Children's doctor appointments. Father's claim here is a request for us to reweigh the evidence, which we cannot do.

---

[8] Father does not challenge the other elements of the termination statute.

Accordingly, the evidence was sufficient to terminate Father's parental rights.

## Conclusion

DCS's actions during the pendency of the action did not violate Father's due process rights. The evidence was also sufficient to terminate Father's parental rights. We affirm.

Affirmed.

Brown, J., and Altice, J., concur.