## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 29 2020, 10:05 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT
R.O. (MOTHER)

Donna J. Jameson
Greenwood, Indiana

ATTORNEY FOR APPELLANT
C.Q. (FATHER)

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEY FOR APPELLEE

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of Parent-Child Relationships of A.Q., K.Q., and R.Q. (Minor Children), <br><br> R.O. (Mother), <br><br> and <br><br> C.Q. (Father), <br><br> *Appellants-Respondents,* <br><br> v. | May 29, 2020 <br><br> Court of Appeals Case No. 19A-JT-1997 <br><br> Appeal from the Lawrence Circuit Court <br><br> The Honorable Nathan G. Nikirk, Judge Pro Tempore <br><br> Trial Court Cause Nos. 47C01-1811-JT-373 47C01-1811-JT-374 47C01-1811-JT-375 |

Indiana Department of
Child Services,

*Appellee-Petitioner*

**Baker, Judge.**

[1] R.O. (Mother) and C.Q. (Father) (collectively, Parents) appeal the trial court's order terminating their parent-child relationships with A.Q., K.Q., and R.Q. (collectively, Children).  The Parents argue that the termination order should be reversed because their due process rights were violated.  Finding no due process violation, we affirm.

# Facts

[2] In January 2006, then-sixty-eight-year-old Father (who was born in 1938) was substantiated[1] by the Department of Child Services (DCS) for sexual misconduct with a minor.  The minor was then-fifteen-year-old Mother (who was born in 1990).

---

[1] After receiving a report of abuse or neglect and investigating the allegations, DCS must either find the report "substantiated" or "unsubstantiated."  Ind. Code § 31-33-8-12.

[3] A.Q. was born to Parents in July 2010. In February 2011, DCS substantiated allegations of neglect because of A.Q.'s failure to thrive. In May 2011, new neglect allegations were substantiated for, among other things, permitting A.Q. to be alone with Father despite his substantiated history of sexual misconduct with a minor.

[4] K.Q. was born in May 2012. In February 2013, DCS substantiated allegations of neglect against Parents for engaging in domestic violence in the presence of the children. In April 2013, DCS filed a petition alleging that the children were Children in Need of Services (CHINS) because both children had sustained numerous, significant injuries (including lacerations, contusions, hematomas, abrasions, and bruises) requiring medical treatment over the past year. Evidently, the family participated appropriately, as the CHINS case was closed on May 7, 2014.

[5] On January 26, 2015, DCS received a report of child abuse regarding A.Q. She had dark bruises on her face and chin and was taken to the hospital for an assessment. A physician at Riley Hospital in Indianapolis concluded that the most likely medical explanation of the child's injuries was physical abuse. Subsequently, A.Q. participated in a forensic interview. She disclosed the following in that interview: Mother had held her up by the chin and shut her head in a door; Mother had grabbed her by the throat, pushed her up against a wall, and slammed her down; and Mother had caused scarring to A.Q.'s chin

with a fork. The four-year-old stated that Mother did this to her because "mommy don't love me[.]" Ex. Vol. I p. 17.[2]

[6] DCS removed the children from Parents' care and custody and filed a petition alleging that the children were CHINS on January 27, 2015. On April 27, 2015, the trial court found the two children to be CHINS. The trial court later entered a dispositional decree requiring Parents to participate with services, including completing a parenting assessment, participating in individual and couples therapy, participating with home-based casework, and complying with any recommendations stemming from those services.

[7] R.Q. was born on June 20, 2015. On June 23, 2015, DCS removed R.Q. from Parents' care and custody based on the ongoing CHINS case for R.Q.'s siblings and, on June 25, 2015, filed a petition alleging that R.Q. was a CHINS. The trial court found R.Q. to be a CHINS on February 23, 2016.[3]

[8] During the approximately four years between the adjudication of the older children as CHINS and the termination hearing in this case, Parents and Children participated in numerous services, including therapy, individual therapy, counseling, couples therapy, family consultant, supervised visitation, clinical services specialist, DCS case management services, parent aid,

---

[2] On November 30, 2015, Mother pleaded guilty to Level 5 felony battery on a person less than fourteen.

[3] The reason for the lengthy delay between the filing of the R.Q. CHINS petition and the trial court's CHINS adjudication is not clear from the record.

budgeting aid, multiple psychological evaluations, First Steps, home-based casework and case management, child and family team meetings (CFTMs), tutoring, and mental health assessments. Despite all the services, Parents remained "adamant that everybody else is at fault but them," tr. vol. III p. 139, and had "zero recognition of what they've done" that caused the CHINS and termination cases to be filed, tr. vol. VII p. 81.

[9] Over the course of the CHINS case, visits did not go well and highlighted the lack of a bond between Parents and Children. During visits, Father was angry, demanding, and threatening, causing the providers to have safety concerns. Mother frequently became agitated and emotional, yelling at Children; Father engaged in manipulative behavior with respect to A.Q.; and Parents frequently made inappropriate comments and had inappropriate discussions. A second visitation supervisor had to be added because of the safety concerns expressed by the first. Children were reluctant to visit Parents and often interacted with service providers more than Parents at those visits. Visits were suspended permanently in August 2018 for K.Q. and R.Q.; they had ended before then for A.Q.

[10] A home-based therapist working with the family believed that Children were not safe in Parents' presence. A.Q. had "a lot of emotional toil following visitation and phone calls" with Father, including panic attacks and nightmares. Ex. Vol. I p. 57. K.Q. and A.Q. were vehement about not wanting to return to their Parents' custody, and R.Q. had no bond or connection with Parents. A.Q.

once reported that if she had to return to Parents, there would have been "severe physical retaliation that could lead to her death." *Id.* at 58.

[11] In June 2015, DCS substantiated allegations of sexual abuse with respect to Father. A.Q. had revealed that Father had sexually abused her, saying that he had vaginally penetrated her with a pencil over fifty times. A provider who conducted a parenting assessment of Father concluded that he was deceptive about DCS's involvement, his past substantiation of sexual abuse, and his relationship with Children.

[12] In April 2016, K.Q. and A.Q. completed psychological evaluations to help determine whether they had been coached in their allegations of physical and sexual abuse. The clinical psychologist reported that K.Q. was traumatized, did not want to talk about her parents, and had test scores that were indicative of "youth who have suffered significant abuse and/or neglect in their early years, and who currently demonstrate attachment concerns." Ex. Vol. 1 p. 90. She concluded that A.Q. had "endured significant sexual trauma" and had seen her parents having sex and abusing each other and had been abused by them. Appellants' Joint App. Vol. II p. 56. The psychologist found no evidence that either child had been coached and diagnosed both children with post-traumatic stress disorder and impaired attachment ability. As to Parents, the psychologist testified as follows at the termination hearing:

> The totality of my finding[s] showed stark contrast between what the biological parents reported to me and what records showed. Showed significant trauma in the children[, and] substantiated

that there had been abuse of the children and that they had been traumatized at early ages. And when records show me that there has been at that point, five years of DCS involvement, at least intermittently, in which . . . there's services provided, and through the course of multiple services and involvement with the agency and the court, that there is still zero recognition of what they've done, that's a concern for me.

I probably wouldn't have made that recommendation [to terminate the relationship] as firmly if there hadn't been years of basically, failed efforts to get these parents to get on board and to say, yeah, maybe we shouldn't beat each other up in front of the children, or to be honest. But to come at this point and be as deceptive as they were, and as lacking in any ownership and insight as they are, tells me that the prognosis for change was not good.

Tr. Vol. VII p. 81.

[13] Mother submitted to psychological evaluations in July 2015 and December 2016. The first psychologist was unable to reach a conclusive diagnosis because of Mother's responses and predilection for presenting herself in an overly favorable light. She recommended that Mother participate in individual therapy. The second psychologist diagnosed Mother with persistent depressive disorder, major depressive disorder, anxiety disorder, and mixed personality disorder with emotionally unstable and antisocial features. That psychologist recommended that therapy continue and/or additional therapies be added, but noted that any potential progress "would take a substantial amount of time." Appellants' Joint App. Vol. II p. 62. Father also submitted to a psychological evaluation and presented with a strong pattern of denial during the evaluation.

The psychologist recommended that Father engage in individual and couples therapy but stated that given Father's adamant denials, any progress would be slow.

[14] Parents participated to varying degrees with court-ordered services, including individual therapy, couples therapy, and home-based services. They generally attended visits. But despite the many services offered, and years of participation, little to no progress was made on the underlying issues.

[15] On November 5, 2018, DCS filed petitions to terminate the parent-child relationships between Parents and Children. The termination hearing took place on April 18, 25, 26, and 29, 2019. At that time, A.Q. and K.Q. had been placed in the same foster home for four years, and R.Q. had been there since birth. All three were bonded to the foster family and working on their respective issues and traumas. The Family Case Manager, Court Appointed Special Advocate, and all service providers who worked with Children testified that termination was in Children's best interests.

[16] On July 29, 2019, the trial court entered an order granting DCS's petitions. In pertinent part, the trial court found as follows:

> 183.   The Court further finds that Mother's complete lack of ability after nearly 4.5 years of therapy and services to recognize and protect her children is extremely alarming, especially in light of the fact that Mother herself testified that she made an allegation against [Father] when she was a minor child.

198. The Court finds that Father continues to deny, minimize and distort the trauma the children have endured. Instead, Father attempted to blame the [foster] placement and divert issues onto the foster parents, service providers, and investigators. Father's complete lack of ability to recognize the children's issues demonstrate his inability to protect them.

***

Conclusions

***

. . . Mother and Father have had since June 17, 2015 for [A.Q.] and [K.Q.] and April 11, 2016 for [R.Q.)] . . . to accomplish the steps necessary to have their children returned to their care. The Court believes there is a clear pattern of abuse and neglect by Mother and Father. Mother has a criminal conviction for battery against [A.Q.] and DCS substantiated sexual abuse against Father. In addition, the evidence presented demonstrates that several providers have identified behavioral issues, PTSD, and genuine fear exhibited by the children in regard to their parents. Father has failed to comply with services and while Mother has been somewhat compliant, Mother continues to deny the most basic facts that led to the removal of the children. The Court simply does not believe Mother understands or appreciates the level of trauma the children (especially [K.Q.] and [A.Q.]) have suffered.

Appealed Order p. 22, 24, 26-28. Parents now appeal.

# Discussion and Decision

[17] The only argument that Parents make on appeal is that the termination order should be reversed because their due process rights were violated. Specifically, they argue that there are specific services that they should have been provided that DCS did not offer to them. Mother maintains that she should have received more intensive mental health services, and Father insists that he should have been referred to sex offender treatment and that A.Q. and Parents should have received family therapy.

[18] Initially, we note that this appeal is the first time Parents make this argument. At no point during the CHINS case did they request additional services, nor did they argue at the termination hearing that the termination petitions should be denied based on a due process violation. As such, they have waived the argument altogether. *In re N.G.*, 51 N.E.3d 1167, 1173 (Ind. 2016) (holding that "a party on appeal may waive a constitutional claim, including a claimed violation of due process rights, by raising it for the first time on appeal"); *see also In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000) (holding that "a parent may not sit idly by without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting").

[19] Waiver notwithstanding, we note that parents are constitutionally entitled to fundamentally fair procedures in termination proceedings. *E.g.*, *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982). Because of the ways in which the CHINS and termination statutes interlock, "procedural irregularities in a CHINS

proceeding[] may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights." *A.P. v. Porter Cty. Office of Family & Children*, 734 N.E.2d 1107, 1112-13 (Ind Ct. App. 2000).

[20] Parents do not allege that they were not provided with sufficient hearings during the CHINS proceeding, nor do they allege that they did not receive notice of all required hearings or service of court orders, petitions, and motions. They were each represented by counsel and do not allege that they did not have the opportunity to present evidence or cross-examine witnesses at CHINS and termination hearings. In other words, they undisputedly received all the *judicial* process that was due to them.

[21] With respect to the conduct of DCS, it is true that DCS shortcomings may violate the due process rights of parents in the context of CHINS and termination proceedings. *In re T.W.*, 135 N.E.3d 607 (Ind. Ct. App. 2019), *trans. denied*. The *T.W.* Court held that:

> for a parent's due process rights to be protected in the context of termination proceedings, DCS must have made reasonable efforts to preserve and/or reunify the family unit in the CHINS case (unless the no reasonable efforts exception applies). What constitutes 'reasonable efforts' will vary by case, and as noted above, it does not necessarily always mean that services must be provided to the parents.

*Id.* at 615.

[22] In *T.W.*, DCS essentially decided as soon as the father was released from incarceration that the child would be better off in foster care. As a result, the Family Case Manager made no genuine efforts to provide the father with any services or support, going so far as to cancel visits between father and child. In that case, this Court found that "DCS wholly failed to make reasonable efforts" to preserve the relationship between the father and his child, thereby denying the father's due process rights. *Id.* at 618.

[23] Here, in contrast, DCS gave Parents *four years* to make progress on their very serious issues.[4] Parents and Children were provided with many services, including individual therapy, counseling, couples therapy, family consultant, supervised visitation, clinical services specialist, DCS case management services, parent aid, budgeting aid, multiple psychological evaluations, First Steps, home-based casework and case management, CFTMs, tutoring, and mental health assessments. We can only find that these efforts were more than reasonable under the circumstances.

[24] Yes, DCS failed to provide more intensive therapy to Mother (though it did offer her many years of therapy in which she made little to no progress) and sex offender treatment to Father (though he continued to adamantly deny that he abused A.Q. and undoubtedly would have refused to participate sincerely with

---

[4] In fact, Parents have received more than four years of services. They received services in 2006 when Father molested teenaged Mother. They again received services in 2011 when multiple allegations of neglect were substantiated and again for approximately one year in 2013-14 during their first CHINS case.

such a service). DCS also failed to refer A.Q. and Parents for family therapy (an understandable decision, given A.Q.'s therapist's belief that any further contact between A.Q. and Parents would be harmful to A.Q.'s mental and emotional health). But the omission of these very specific services—for which Parents never asked—does not undercut the reasonableness of the substantial efforts DCS made to help reunify this family.

[25] Despite the years of services, Parents made little to no progress. They continued to deny there were problems, blamed everyone around them while accepting no responsibility for their actions, and denied that they needed to change the way they parented. There is no reason, based on this record, to believe that additional services would have in any way altered their trajectory.

[26] For all these reasons, we decline to find that Parents' due process rights were violated during the CHINS and/or termination proceedings.

[27] The judgment of the trial court is affirmed.

Bradford, C.J., and Pyle, J., concur.